UNITED STATES of America, Plaintiff-Appellant,

v.

AZZARELLI CONSTRUCTION COMPANY et al., Defendants-Appellees,

State of Illinois, Intervening Defendant.

No. 80–1333.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1980.

Decided April 30, 1981.

Bruce E. Fein, Washington, D. C., for plaintiff-appellant.

Stephen P. Juech, Asst. Atty. Gen., State of Ill., Antitrust Div., Barry T. McNamara, Chicago, Ill., for defendants-appellees.

Before BAUER, WOOD and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

The United States filed this civil action seeking damages and forfeitures under the False Claims Act, 31 U.S.C. § 231 et seq. (1976), from several defendants (the "Contractors") involved in a highway construction project bid-rigging conspiracy. The State of Illinois intervened for the purpose of moving to dismiss the claims of the United States. Upon the motion of the Contractors and the State of Illinois, the district court dismissed the complaint.[1] We affirm.

The complaint alleges that the United States and the State of Illinois concluded a cooperative agreement for the financing and construction of two public highway projects in Illinois. Under the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq. (1976), the Federal Highway Administration furnished 70 percent of the funds used to pay for the projects. As required under the Highway Act, the state sought competitive bids on the highway projects and required affidavits from all bidders certifying that they had not undertaken any action in restraint of competitive bidding.

The complaint further alleges that the defendants secured the contracts for these two projects through the use of collusive bidding practices. The successful bidders also allegedly knew that the fraudulent claims that they submitted to the State of Illinois would be partially reimbursed by the United States. This illegal conspiracy allegedly damaged the United States by raising the costs of the two highway projects above levels that would have pertained in the absence of the fraudulent acts of the defendants. As authorized by the False Claims Act, the complaint seeks the $2,000 statutory forfeiture for each fraudulent claim filed by the Contractors, as well as double damages.

### I. The Statutory Framework

The False Claims Act was enacted shortly after the Civil War to stop the frauds

---

1. The United States had also asserted a claim under the Clayton Act, 15 U.S.C. § 15a (1976), but now concedes that the district court correctly dismissed the antitrust claim because the State of Illinois suffered all of the antitrust injuries caused by the alleged conspiracy.

perpetrated by government contractors during that period. As originally enacted, the Act contained both criminal and civil provisions. As codified at the present time,[2] the civil remedies provide for double damages and $2,000 statutory forfeitures from any person

> who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any ... affidavit, ... knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim ....

31 U.S.C. § 231 (1976). The complaint alleges that the Contractors violated each of the three clauses of the above-quoted portion of the Act by causing a false claim to be presented, by filing false affidavits for the purpose of obtaining payment of the false claim and by entering into a conspiracy to obtain the payment of the false claim.

Without purporting to exhaust the various elements of the statute, it is well established that the claim must be made "upon or against the Government of the United States ...." 31 U.S.C. § 231 (1976). Because the statute prohibits acts that *cause* a false claim to be presented, the requirements of the statute can be met even where the claim is actually filed with a state agency, as in the instant case, and the state then channels the claim to the federal government for payment. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544, 63 S.Ct. 379, 384, 87 L.Ed. 443 (1943). *See also United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) (subcontractor held liable for a false claim presented to the Government by the general contractor).

■ There must, however, still be a claim presented "upon or against the Government of the United States" to sustain civil liability under the False Claims Act. As suggested earlier, Congress created the Act in response to the widespread loss of federal funds through fraud during the Reconstruction era. As the Supreme Court has stressed many times, "[i]t seems quite clear that the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims ...." *Rainwater v. United States*, 356 U.S. 590, 592, 78 S.Ct. 946, 952, 2 L.Ed.2d 996 (1958). *See also United States v. Neifert-White Co.*, 390 U.S. 228, 232, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968); *United States v. McNinch*, 356 U.S. 595, 598–99, 78 S.Ct. 950, 952, 2 L.Ed.2d 1002 (1958); *United States v. Ekelman & Associates, Inc.*, 532 F.2d 545, 551 (6th Cir. 1976). Otherwise stated, the allegedly false claim must be one that is capable of causing an injury to the funds or property of the United States if the claim is in fact paid.

The differences between *United States v. Cohn*, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926), and *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), provide a clear illustration of how this principle applies. In *Cohn*, the Government was temporarily in possession of the merchandise of another person. A fraudulent claim was presented against the Government for the delivery of the merchandise. The Supreme Court found the False Claims Act inapplicable because no claim was asserted against the money or

---

2. The civil provisions of the False Claims Act have been codified in Title 31 but the official text of the statute is that found in the Revised Statutes, *see* Rev.Stat. §§ 3490–94, 3458, which differs in immaterial ways from that cited here.

The official text of the statute is also set out in *United States v. Bornstein*, 423 U.S. 303, 305–07 n.1, 96 S.Ct. 523, 526–527 n.1, 46 L.Ed.2d 514 (1976).

property of the Government. *Cohn,* 270 U.S. at 345–46, 46 S.Ct. 252–253. In and of itself, the claim was not one that could injure the United States.

In *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 317, 87 L.Ed. 443 (1943), the Court faced a bid-rigging scheme similar to the one alleged here. The defendants contracted with local governmental units for Public Works Administration projects. Although successful bidders were actually paid by the local authorities, the payments were made from a joint bank account containing both federal and local funds. The Court ruled that the defendants were liable under the False Claims Act. *Cohn* was distinguished on the ground that there the Government was merely a bailee, while in *Marcus* the defendants wrongfully obtained money which was the property of the Government. *Marcus,* 317 U.S. at 545, 63 S.Ct. at 384.

## II. The Federal-Aid Highway Act

In order to ascertain whether the Contractors were liable here, therefore, we must determine whether, under the Federal-Aid Highway Act, the false claims actually impaired funds in the treasury (or injured the treasury) of the United States. Because the Highway Act provides no obvious resolution for this question, we must examine the statutory scheme in some detail.

Highway Act construction projects are financed by funds drawn from the Highway Trust Fund. Congress authorizes the Secretary of Transportation to apportion, by the use of various statutory formulae, a specific sum of money to the states. 23 U.S.C. § 104 (1976). Through the apportionment, the federal contribution to each state becomes fixed for the period in question. The apportioned funds are then "available for expenditure" by the states on qualifying highway projects. 23 U.S.C. § 118 (1976).

Funds available to the states are administered by the Federal Highway Administration and the Secretary of Transportation. A state must secure certain approvals from the Secretary before federal funds may be committed to any particular highway construction project. First, the state must obtain the Secretary's approval of a program containing specific projects proposed as recipients of the funds apportioned to that state. 23 U.S.C. § 105 (1976). The state must then submit each particularized construction project for approval, 23 U.S.C. § 106 (1976), eventually leading to a formalized "project agreement" concerning the construction and maintenance of the project in question. 23 U.S.C. § 110 (1976). Eventually, the state advertises for bids on the project, contracts with a private party for the desired construction and submits the contract for the approval of the Secretary of Transportation. 23 U.S.C. § 112 (1976).

The state supervises the construction project and pays the contractors out of state funds. Following a federal inspection to determine whether the project conforms to various Highway Act standards, 23 U.S.C. § 114 (1976), the state is entitled "to payment out of the appropriate sums apportioned to it of the unpaid balance of the federal share payable on account of such project." 23 U.S.C. § 121(b) (1976).[3]

## III. The Injury Requirement

Assuming, without deciding, that the Government here still possessed a proprietary interest in the funds so that the allegedly false claims were filed "upon or against" the United States,[4] the Govern-

---

**3.** The term "unpaid balance" is used because advance payments are authorized in certain circumstances. *See* 23 U.S.C. § 124 (1976).

**4.** The Contractors and the State of Illinois maintain that the federal highway funds were actually expended (and ceased to be federal funds) at the time of their apportionment. Section 118(a) provides that

On and after the date that the Secretary has certified to each State highway department the sums apportioned to each Federal-aid system or part thereof pursuant to an authorization under this title, or under prior Acts, such sums shall be available for expenditure under the provisions of this title. 23 U.S.C. § 118(a) (1976). Under this view, the allegedly false claims in the instant case were made upon state funds in federal custody but

ment must still show that the claims injured the United States. Under the Federal-Aid Highway Act, the Government contributed a fixed sum to Illinois to assist in the construction of the two highways at issue here. The ceiling on the federal contribution imposed by the Highway Act, however, operated to insulate the United States from any overcharge. Although the overcharge may have increased the contribution of the United States toward the two particular projects, it did not affect the Government's overall contribution to Illinois.

It is thus the fixed and determinate yearly contribution established under the Highway Act that distinguishes this Act from programs involving open-ended federal expenditure programs, such as Medicaid or the Public Works Administration program at issue in *Marcus*. In an open-ended program, the Government agrees to compensate a prescribed proportion of all qualifying state program expenditures with no ceiling on the total amount of funds that may be disbursed. Any overcharge in a Medicaid-type program does result in an impairment of the federal treasury because the government expends money that it would not expend but for the overcharge. Other courts have recognized the applicability of the False Claims Act to such programs, *United States v. Jacobson*, 467 F.Supp. 507 (S.D.N.Y.1979); *United States ex rel. Davis v. Long's Drugs, Inc.*, 411 F.Supp. 1144 (S.D.Cal.1976), but the different features of the Federal-Aid Highway Act grants compel a contrary result under this program.

The Government, in other nearly identical litigation, has in fact recognized that this result is correct in a context similar to that of the False Claims Act. *See Illinois v. Brighton Building & Maintenance Co.*, No. 77–C–4541 (N.D.Ill.1977). Thus, in *Brighton*, a suit brought by Illinois under the Clayton Act for bid-rigging in a Highway Act construction project, the United States forcefully argued that it was not a necessary party to the suit because Illinois suffered the full effect of the bid-rigging. *Azzarelli*, Joint Appendix at 374. The Government argued that once a fixed amount of federal funds was dedicated to Illinois for use on qualifying highway projects, the burden imposed by any improperly inflated prices was borne entirely by the state through the reduction of funds that the state had for use on other highway projects. The Government's contribution to the state remained fixed, however, and no additional federal funds were expended because of the overcharge. As the Government contended, "[i]f . . . the Court takes into account the working of the apportionment process established by the Federal Aid Highway program, it will recognize that the full impact of the injury is borne by the state." *Azzarelli*, Joint Appendix at 504.

Indeed, the Government has maintained this position with respect to the Clayton Act claim in the instant case, conceding that it suffered no antitrust injury as a result in the overcharges. *See* note 1 *supra*. The Government attempts to avoid the implications of its concession by arguing that the United States, if a false claim is presented to it, need not be injured to maintain an action under the False Claims Act. As we have noted above, however, this view is contrary to the holding in *United States v. Cohn*, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926). In light of *Cohn*, we are unable

not on federal funds as such. *See United States v. Cohn*, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926).

As an alternative argument, the same parties assert that the funds were expended when the Secretary approved the relevant construction projects. Under 23 U.S.C. § 106(a), the approval of any project constitutes a "contractual obligation of the Federal Government for the payment of its proportional contribution there-

to." The approval of the project gives the state a "vested right" to the apportioned funds. 42 Op.Att'y Gen. 347, 353–54 (1967). Under this interpretation, the United States had also lost its proprietary interest in the funds prior to the alleged violations of the False Claims Act. We decline to address either of these contentions in light of our resolution of the other issue present in this case.

to distinguish the conceded lack of any antitrust injury from the apparent absence of any injury sufficient under the False Claims Act.[5]

The Government also argues that it is entitled to the $2,000 statutory forfeiture for each false claim submitted by the Contractors because there is no injury requirement for monetary awards under the forfeiture provision of the False Claims Act. With respect to this question, in order to maintain an action for the $2,000 forfeiture prescribed by the statute, there need be no proof of specific damages. *See, e. g., United States v. Hughes,* 585 F.2d 284, 286 n.1 (7th Cir. 1978). As the Supreme Court made clear, however, in construing a statute the Court regarded as paralleling the provisions of the False Claims Act, the lack of any requirement of specific evidence of damages does not dispense with the need to establish an injury. *Rex Trailer Co. v. United States,* 350 U.S. 148, 152–53, 76 S.Ct. 219, 221–22, 100 L.Ed. 149 (1956). Here, the injury was suffered by the State of Illinois, and it is that governmental body which has a cause of action resulting from the overcharge.

■ In summary, the federal contribution to highway construction in Illinois for the year in question was a fixed sum. Although Illinois received that sum,[6] the alleged overcharges required it to pay out an excessive portion of the grant to the Contractors, thus impairing the remainder of the amount. It is Illinois whose treasury funds have been reduced by the overcharges. In the framework of periodic grants to the states, if the Government may sue under the False Claims Act, the Government would presumably be able to replenish its treasury to a *higher* level than that pertaining after the grant to Illinois was originally made. We are reluctant to award the Government such a serendipitous benefit. Accordingly, the judgment of the district court is

AFFIRMED.

5. In an attempt to meet the injury requirement, the Government argues in its brief that the United States was injured because fewer highway miles were constructed because of the overcharge. Such an "injury" is not alleged in the complaint and, if in fact such a shortfall occurred, this would not be an injury to the money or property of the United States within the meaning of the False Claims Act.

The Government also argues that it was in fact injured because it would not have paid the State of Illinois had it known about the overcharges. This contention overlooks the fact that the Government is contractually obligated to pay the state the appropriate federal contribution once the project is approved. 23 U.S.C. § 106 (1976). The Government argues that the violation of the Federal-Aid Highway Act competitive bidding requirements found in 23 U.S.C. § 112 (1976), would have allowed it to withhold its contribution. The Government misconceives, however, where the duties prescribed by § 112 reside. Section 112 requires the *states* to award contracts by certain procedures. Peterson and Kennan, *An Analysis of Administration of the Federal-Aid Highway Program,* 2 Envt'l L.Rep. 50001, 50008 (1972). If a state failed to follow these procedures, an allegation lacking in this case, the Government might well be able to withhold the federal contribution to the project. Section 112 does not impose any duties on the Contractors themselves, however, and the government could not withhold its contribution because of their alleged bid-rigging.

6. There are no allegations in the instant case that Illinois did not use its entire grant for the period in question. Although this would arguably present a different circumstance, the Government maintained in the *Brighton* litigation that a partly unused grant would still not prevent Illinois from suing for the entire antitrust injury. *Azzarelli,* Joint Appendix at 375–76. We, of course, express no opinion on the resolution of the related False Claims Act question.