**UNITED STATES of America, ex rel. Tyrone C. FAHNER, Attorney General, State of Illinois, Plaintiff,**

v.

**Dr. St. Barth ALASKA, Defendant.**

**No. 82 C 1381.**

United States District Court, N.D. Illinois, E.D.

March 21, 1984.

Neil F. Hartigan, Atty. Gen., State of Ill., James C. O'Connell and John E. Huston, Sp. Asst. Attys. Gen., Chicago, Ill., for plaintiff.

Dr. St. Barth Alaska, pro se.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

This civil action, instituted by the Attorney General of the State of Illinois on behalf of the United States and the People of the State of Illinois, charges that the defendant, Dr. St. Barth Alaska ("Dr. Alaska"), defrauded the Medicaid program by submitting claims for services which he did not in fact perform. Monetary relief is sought pursuant to both the Federal False Claims Act, 31 U.S.C. § 231 ("Section 231") and the Illinois Public Welfare Code, Ill. Rev.Stat. ch. 23, § 8A–7 (1982). A bench trial was held on February 8–10, 1983, and the court hereby enters the following findings of facts and conclusions of law.

I. *Findings of Fact.*

Pursuant to 42 U.S.C. § 1396 *et seq.*, the federal government has authorized appropriations for grants to those states operating approved medical assistance programs for the needy. In the State of Illinois, the Department of Public Aid ("IDPA") is the agency charged with the responsibility of administering such a program. Under Illinois' program, recipients determined to be eligible for medical assistance obtain a medical assistance card which must be shown to any physician, dentist or optometrist who elects to provide medical care.

The IDPA supplies a standard claim form to optometrists which must be submitted before any payments will be issued for services rendered. This form, DPA 134, contains the following certification:

"This is to certify that the information above is true, accurate and complete, that payment therefor has not been received, that the charges approved by the Department of Public Aid will constitute the full and complete charge therefor, that I will not accept additional payment from any person or persons. I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under TITLE XIX of the Social Security Act and to furnish information regarding any payments claimed as the State Agency may request. I understand payment is made from Federal and State funds and that any satisfaction or concealment of a material fact may lead to appropriate legal action. I further certify that in compliance with TITLE VI of the Civil Rights Act of 1954 I have not discriminated on the grounds of race, color, or national origin in the provision of service."

Once a DPA 134 form is reviewed and approved by IDPA, payment is issued to the optometrist who provided the medical service. The United States of America, through the Department of the Treasury, and the State of Illinois, through the Treasurer of the State, each contribute 50% of the funds necessary for the payments of bills submitted.

Dr. Alaska is an optometrist licensed by the State of Illinois. He maintains two offices in this area: one at 1600 North Milwaukee Avenue, Chicago, Illinois, and another at 3225 South Harlem Avenue, Berwyn, Illinois. Between May 1, 1976, and May 31, 1980, the time frame analyzed by plaintiffs, Dr. Alaska participated in the medical assistance program operated by the State. That is, he was authorized to submit bills, on form DPA 134, to IDPA for optometric services rendered to Medicaid program recipients and, upon approval by IDPA, to receive payment from the State and the Federal Government based on such services.

In support of their claim that Dr. Alaska defrauded the Medicaid program, plaintiffs introduced four categories of evidence at trial, none of which was contradicted by defendant through his own testimonial or documentary evidence. The first category consisted of live testimony, and written and oral stipulations. This evidence was all to the effect that bills were submitted to IDPA on behalf of individuals who never in fact received an eye examination or a pair of eyeglasses from Dr. Alaska.[1] The live testimony represented 89 claims so submitted, with a total of $3,225.06 paid out by plaintiffs. (*See* Appendix A.*) The written stipulations represented 50 bills so submitted, with a total of $1,965.94 paid out. (*See* Appendix B.) Finally, the oral stipulations represented 164 claims submitted for services never actually rendered, with $5,861.58 paid out. (*See* Appendix C.) In sum, this first category of direct evidence constituted 303 bills that were submitted by Dr. Alaska and for which he received a total of $11,052.58.

---

**1.** The stipulations were to the effect that if called to testify, all the individuals would state that neither they nor any of their dependents received an eye examination or a pair of eyeglasses from Dr. Alaska.

* Appendices omitted from published opinion.

The second category of evidence introduced by plaintiffs is the so-called "Z document" evidence. Of particular importance to this category is Illinois Public Aid Form DPA 136, R–8–78. James Mitchell, Supervisor of Forms Control for IDPA, testified that this form was first available for distribution in Chicago on November 3, 1978. The record indicates, however, that Dr. Alaska used this form to claim and receive payment for services he purportedly rendered prior to November 3, 1978. That is, the date of the alleged services predate November 3, the date when the forms were first distributed in the Chicago area. Despite being given several opportunities to do so by the court, Dr. Alaska failed to offer any reasonable explanation as to why he filed a form certifying services rendered on a date which preceded the actual availability of that same form. The "Z document" evidence represented a total of 248 bills, with total payments of $8,498.94. (*See* Appendix D.)

The third category of evidence refers to the so-called "high volume" days. Plaintiffs contended, in effect, that it was physically impossible for Dr. Alaska to have seen as many patients as he claims he did on October 11 and 16, 1978. They offered a total of six bills which did not overlap with the prior two categories of evidence in support of this category. The evidence presented by plaintiffs on this issue, however, was largely circumstantial and will thus be discounted by the court.

The fourth and final category of evidence presented by the plaintiffs is the so-called "snow-day" evidence, which refers to the large numbers of bills submitted by Dr. Alaska between January 14–18, 1979, days during which the Chicago area received extensive snowfall. This category represented a total of 11 bills which did not overlap with other categories. This evidence, like the high volume evidence, was largely circumstantial, and it too must be discounted.

Dr. Alaska presented no concrete evidence, testimonial or otherwise, to contradict plaintiff's proof. He did argue that some recipients had two medical cards, urging the court to draw the inference that they gave one of the cards to other individuals and that he provided services to this latter group. This contention, however, was not supported by any evidence, and fails to consider the fact that only one medical card is valid at any given time. Dr. Alaska also argued that some recipients lost their medical cards, thereby allowing the persons who found the cards to use them to obtain optometric services from him at his Berwyn office. This argument is wholly unsupported by the record and, additionally, is quite illogical, for no explanation was ever offered as to why any individual who found a medical card on the South Side of Chicago would travel to Berwyn, Illinois, to utilize the card. Finally, Dr. Alaska directs the court's attention to the testimony of two witnesses that they did receive optometric services from him. But Dr. Alaska plainly ignores other testimony from those same witnesses that other bills were submitted on their behalf and on behalf of members of their families for services never actually rendered. Indeed, the reasonable inference is that when Dr. Alaska received a medical card from a patient, he used information on that card to manufacture false bills for family members never treated.

It is thus undisputed that, with respect to plaintiff's first two categories of evidence, Dr. Alaska submitted 551 claims for optometric services which were not in fact rendered. It is also undisputed that as a result of these 551 claims and Dr. Alaska's accompanying certification that all the information he provided was accurate and true, a total of $19,551.52 was paid out by plaintiffs.

## II. *Conclusions of Law.*

### A. *Liability under the Federal False Claims Act.*

The False Claims Act ("the Act") applies to persons who:

"make or cause to be made, or present or cause to be presented, for payment or approval ... any claim upon or against

the Government of the United States ... knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, ..." 31 U.S.C. § 231.[2] Two civil penalties may be imposed under the Act. First, any person who "shall do or commit any of the acts prohibited ... shall forfeit and pay to the United States the sum of two thousand dollars ...." *Id.* Second, the person is liable for double the damages sustained by the United States "by reason of" such acts. *Id.*

■ Originally enacted to punish and prevent frauds being perpetrated by contractors during the Civil War, the Act is used to compensate the government for false claims brought against it. *United States v. Bornstein,* 423 U.S. 303, 309, 96 S.Ct. 523, 528, 46 L.Ed.2d 514 (1976); *United ed States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Its chief purpose is "to provide for restitution to the government of money taken from it by fraud." *Hess,* 317 U.S. at 551, 63 S.Ct. at 388. In achieving this aim, the "statute reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White,* 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1968). *See also United States v. RePass,* 688 F.2d 154, 157 (2d Cir.1982); *United States v. Silver,* 384 F.Supp. 617 (E.D.N.Y.1974), *aff'd,* 515 F.2d 505 (2d Cir.1975).

Without purporting to exhaust all the various aspects of the Act, it is clear that, for purposes of this action, plaintiffs must establish the following elements: (1) Dr. Alaska presented or caused to be presented, for payment or approval, to the Government of the United States a claim upon or against the United States; (2) the claim was false, fictitious or fraudulent; and (3) Dr. Alaska knew that the claim was false, fictitious or fraudulent. *See United States v. Lawson,* 522 F.Supp. 746, 749–50 (D.N.J. 1981).

■ With respect to the first element, that a "claim" be presented upon or against the United States, it is well-established that the requirements of section 231 can be met even where the claim is actually filed with a state agency, as in the instant case, and the state then channels the claim to the federal government for payment. *See Hess,* 317 U.S. at 544, 63 S.Ct. at 384; *United States v. Azzarelli Construction Co.,* 647 F.2d 757, 759 (7th Cir.1981). As recognized in *Azzarelli,* in a program such as Medicaid, the Government agrees to compensate a prescribed proportion of all qualifying state program expenditures with no ceiling on the total amount of funds that may be disbursed. Any fraud-based claim in the Medicaid program thus results in an impairment of the federal treasury because the Government expends money it would not expend "but for" the fraud. 647 F.2d at 761.[3] Indeed, many courts have recognized the applicability of the False Claims Act to Medicaid programs, *see, e.g., Peterson v. Weinberger,* 508 F.2d 45 (5th Cir.), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975); *United States v. Jacobson,* 467 F.Supp. 507 (S.D.N.Y.1979); *United ed States ex rel. Davis v. Long's Drugs, Inc.,* 411 F.Supp. 1144 (S.D.Cal.1976), ac-

---

**2.** The civil provisions of the False Claims Act have been codified in Title 31 but the official text of the statute is that found in the Revised Statutes, *see* Rev.Stat. §§ 3490–94, 5438, which differs in immaterial ways from that cited here. The official text of the statute is also set out in *United States v. Bornstein,* 423 U.S. 303, 305–07 n. 1, 96 S.Ct. 523, 526–27 n. 1, 46 L.Ed.2d 514 (1976).

**3.** The precise question presented in *Azzarelli* was whether the False Claims Act applied to contractors who had allegedly been engaged in a bid-rigging conspiracy. Noting the distinctions between the Federal Aid-Highway Act and the Medicaid and Public Works Administration programs, the court held that the False Claims Act did not apply. *Azzarelli,* 647 F.2d at 760–62.

knowledging that false claims submitted pursuant to the Medicaid program are ones that cause injury to the funds or property of the United States when those claims are in fact paid.

■ The "knowing" requirement of the False Claims Act has caused some confusion among courts. Some courts have applied common law fraud principles and held that in order to prevail, plaintiff must demonstrate that defendant had a "specific intent" to defraud the Government of the United States. *See, e.g., United States v. Aerodex,* 469 F.2d 1003 (5th Cir.1972); *United States v. Mead,* 426 F.2d 118 (9th Cir.1970). The preponderant view, however, and the view by which this court is bound, is that the Act requires only that the defendant knowingly present a false claim to the Government. *See United States v. Hughes,* 585 F.2d 284 (7th Cir. 1978); *United States v. Cooperative Grain & Supply Co.,* 476 F.2d 47, 58 (8th Cir. 1973); *United States v. Krietemeyer,* 506 F.Supp. 289, 292 (S.D.Ill.1980). As recognized in *Alsco-Harvard Fraud Litigation,* 523 F.Supp. 790, 806 (D.D.C.1981), this view is supported by the language of the statute, which identifies only "intent to defraud" as the requisite state of mind, and "by the fact that the statute is remedial and civil, rather than criminal, in nature."

■ A review of the substantial documentation provided by plaintiffs and the record as developed at trial establishes unequivocally that Dr. Alaska violated the express prohibitions of the False Claims Act. The evidence presented through live testimony, oral and written stipulations and through the so-called "Z documents" demonstrates beyond question that Dr. Alaska presented false and fictitious claims to the United States, with the knowledge that such claims were false and fictitious. The evidence indicates that while Dr. Alaska performed no optometric services, he nevertheless signed a document in which he swore that he did perform those services. The claim forms submitted bore Dr. Alaska's signature, certifying something that the evidence adduced at trial indicates

simply was not so. The services billed were not in fact rendered, and the Government thus paid on the basis of the false claims presented. Dr. Alaska's false certification of the claim form frustrated the Government's attempts to process only valid claims and led to payment for services which were not legitimately covered or payable.

**B.** *Liability under the Illinois Public Aid Code.*

■ The pendent claim is predicated on the Illinois Public Aid Code, Ill.Rev.Stat. ch. 23, § 8A–7 (1982), which provides, in part:

"(b) Any person ... that willfully, by means of a false statement or representation, or by concealment of any material fact, or by other fraudulent scheme or device ... obtains or attempts to obtain benefits or payments under this Code to which he ... is not entitled, or in a greater amount than that to which he ... is entitled, shall be liable for repayment of any excess benefits or payments received, and, in addition, to any other penalties provided by law, civil penalties consisting of (1) interest on the amount of the excess benefits or payments at the maximum legal rate in effect on the date the payment was made to such person, ... for the period from the date upon which payment was made to the date upon which repayment is made to the State, (2) an amount not to exceed 3 times the amount of such excess benefits or payments, and (3) the sum of $2,000 for each excessive claim for benefits or payments."

The court has not uncovered any reported Illinois authority on this recent statute. The statute, however, does seem to closely track the Federal False Claims Act, setting forth elements of liability quite similar to those promulgated by section 231. Accordingly, the court concludes that, based on the substantial documentation provided by plaintiffs and the record as developed at trial, Dr. Alaska clearly violated section 8A–7 of the Illinois Public Aid Code as well

as section 231 of the Federal False Claims Act.

### C. *Damages.*

#### 1. *The Federal Act.*

As previously noted, the Federal False Claims Act provides for a $2,000 forfeiture as well as double the amount of damages sustained by the Government "by reason of" the false claim or claims. These two civil penalties will be addressed *in seriatim.*

■ It is well-established that 31 U.S.C. § 231 provides for a $2,000 forfeiture for *each* false claim submitted by a defendant. *See, e.g., United States v. Ehrlich,* 643 F.2d 634, 637–38 (9th Cir.1981); *Alsco-Harvard Fraud Litigation,* 523 F.Supp. 790, 811 (D.D.C.1981); *United States v. Jacobson,* 467 F.Supp. 507, 508 (S.D.N.Y.1979); *United States v. Cripps,* 460 F.Supp. 969, 976 (E.D.Mich.1978). *But see Peterson v. Weinberger,* 508 F.2d 45, 55 (5th Cir.1975) (court may exercise discretion in imposing forfeitures). A threshold question that must be resolved before the statutory forfeiture can be computed, however, is what constitutes a "claim" under the Act.

In *United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), a subcontractor sent three separately invoiced shipments containing falsely labeled components to a prime contractor. The prime contractor shipped the final product to the government in 35 separately invoiced shipments. The Supreme Court held that the subcontractor was liable for three forfeitures. "A correct application of the statutory language requires … that the focus in each case be upon *the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures.*" *Bornstein,* 423 U.S. at 313, 96 S.Ct. at 529 (emphasis supplied). Had the subcontractor committed one act which caused the false claims to be filed, it would have been liable for only one forfeiture, regardless of the number of claims filed. *Id.* at 312, 96 S.Ct. at 529. The Court noted that the number of false claims submitted by the prime contractor was unrelated to the subcontractor's conduct, stating "[t]he fact that [the prime contractor] chose to submit 35 false claims instead of some other number was, so far as [the subcontractor] was concerned, wholly irrelevant—completely fortuitous and beyond [its] knowledge or control." *Id.*

■ As noted in *United States v. Ehrlich,* 643 F.2d 634, 638 (9th Cir.1981), this strongly suggests that if a person knowingly submits a specific number of false claims, he is liable for an equal number of forfeitures. In the absence of such knowledge, using the number of claims to determine the number of forfeitures would be arbitrary. But where such knowledge is present, it is consistent with the purposes of the Act to impose forfeitures based on the number of false claims submitted. Indeed, the Court stated in *Bornstein,* 423 U.S. at 309 n. 4, 96 S.Ct. at 528 n. 4, that "[i]n cases involving prime contractors the number of imposable forfeitures has generally been set at the number of individual false payment demands that the contractor has made upon the Government." This conclusion is consistent with the Supreme Court's earlier statement that the statutory term "claim" should, in order to effect the remedial purposes of the Act, be broadly construed to include all attempts to defraud the Government out of sums of money. *See United States v. Neifert-White,* 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1968).

■ In this action, it is clearly consistent with the purposes of the Federal False Claims Act to impose forfeitures based on the number of false claims submitted by Dr. Alaska. The evidence adduced at trial established that Dr. Alaska knew he was submitting false claims. Plaintiffs have specifically documented their evidence with the case number, name, voucher number, warrant number and amount of payment for each of 551 claims submitted by Dr. Alaska. Applying the forfeiture of $2,000 for each of these claims, the court has determined that Dr. Alaska's total forfei-

ture under the False Claims Act is $1,102,-000.00.

With respect to the double damage provision, the court finds that a total of $19,-551.52[4] was paid out on Dr. Alaska's 551 false claims. Since the Federal Government and the State of Illinois each contributed one-half of this total payment, the Federal Government's actual damages are equal to one half of $19,551.52, or $9,775.76. Of course, section 231 provides for a *doubling* of the Government's actual damages, so the total double damage award under the Federal False Claims Act for the 551 false claims submitted is $19,-551.52.

Thus, the total damage award to the Federal Government, based on a finding that 551 false claims were submitted by Dr. Alaska, is $1,121,551.52.

### 2. *The Illinois Act.*

As previously discussed, section 8A–7 of Illinois Public Aid Code, Ill.Rev. Stat. ch. 23, § 8A–7 (1982), also provides for a $2,000 forfeiture "for each excessive claim for benefit or payment." Applying this formula to each of Dr. Alaska's 551 false claims, the court concludes that the total forfeiture under the State Act is $1,102,000.00.

With respect to actual damages, section 8A–7 of the Illinois Act differs slightly from the Federal False Claims Act. While 31 U.S.C. § 231 provides for a doubling of the actual damages sustained, section 8A–7 provides for an amount "not to exceed 3 times the amount of ... [the] excess ... payments." As noted above, while a total of $19,551.52 was paid out on the 551 false claims, this amount must be halved in order to correctly determine the actual damages sustained by the State of Illinois. Accordingly, the State's actual damages are $9,775.76, and trebling this amount leads to a total of $29,327.28.

Thus, the total damage award to the State of Illinois, based on a finding that 551 false claims were submitted by Dr. Alaska, is $1,131,327.28.

### D. *Summary.*

In the usual case, a determination of liability and an award of damages, if appropriate, ends the court's discussion of a particular case. This, however, is not the usual case; it is not a case, like many of those cited above, in which a contractor submitted a limited number of false claims on a construction project. In this action, the court has been presented with an overwhelming amount of evidence, all supported by concise and detailed exhibits as to each particular false claim, documenting a consistent pattern of gross misconduct by a licensed professional. The abundant evidence presented in this case clearly reveals that Dr. Alaska has abused this trust by using his position to falsify claims on a wholesale basis and thereby divert for his own use public funds designed to help the needy and the unfortunate. Such conduct undermines the entire Medicaid system itself, which Congress enacted in 1965 to provide for grants to states for medical assistance programs to aid indigents. *See* 42 U.S.C. § 1396 *et seq.* These programs operate on a series of implicit representations: the recipient represents that he or she is in fact entitled to aid, and the physician represents that he or she actually performed the services upon which subsequent claims for payment are based. The pattern of egregious conduct presented here is precisely the type that impairs the integrity of these programs and precludes their successful operation.

The False Claims Act was designed to protect the funds and property of the Government from fraudulent claims. The Government's strong disfavor with the type of conduct engaged in by Dr. Alaska could be no more plainly evidenced than by the provision for statutory forfeiture of $2,000 for each false claim filed. While the

---

**4.** This sum is reached by adding the numbers presented in Part I, *supra:* $3,225.06 (live testimony) + $1,965.94 (written stipulations) + $5,861.58 (oral stipulations) + $8,498.94 ("Z document" evidence).

total damage award in this action may appear to be excessive, it reaches such proportions for the sole reason that Dr. Alaska has been found to have submitted 551 separate false claims.

The impact of both the Federal False Claims Act and the Illinois Public Aid Code as applied to the facts of this case rests with the combined legislative judgment that the statutory forfeiture should be large enough to punish and deter the wrongdoer. In reaching this conclusion, the court is carrying out the mandate of the Federal False Claims Act, which, from the time of its enactment, has served to impose severe penalties upon those who chose to "plunder[ ] ... the public treasury." *United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001 (1958). The specific provisions of section 8A–7 of the Illinois Public Aid Code to the effect that "[a]ny person ... [who] willfully, by means of a false statement ... attempts to obtain benefits or payments under this Code to which he ... is not entitled ... shall be liable for ... the sum of $2,000 for each excessive claim ..." require that equally severe treatment should be applied to Dr. Alaska for the 551 claims submitted by him to the Department of Public Aid.

For the reasons stated above, the court hereby finds that defendant, Dr. St. Barth Alaska, has violated the Federal False Claims Act, 31 U.S.C. § 231, and that the Federal Government is entitled to a damage award of $1,121,551.52. The court also finds that Dr. Alaska has violated the Illinois Public Aid Code, Ill.Rev.Stat. ch. 23, § 8A–7 (1982), and that the State of Illinois is entitled to a damage award of $1,131,-327.28.