UNITED STATES of America ex rel. James M. THOMPSON, Plaintiff,

v.

COLUMBIA/HCA HEALTHCARE CORPORATION, CHC Holdings, Inc., Columbia Hospital Corporation of Bay Area, Columbia Hospital Corporation of Corpus Christi, Corpus Christi Bay Area Surgery, Ltd., and Columbia Surgicare Specialty Hospital, Defendants.

Civil Action No. C–95–0110.

United States District Court, S.D. Texas, Corpus Christi Division.

July 24, 1996.

David L. Perry, Perry & Haas, Corpus Christi, TX, for James M. Thompson.

Jorge C. Rangel, Rangel & Chriss, Corpus Christi, TX, Ernest E. Figari, Jr., Figari & Davenport, Dallas, TX, for Columbia/HCA Healthcare Corp. of Central Texas, CHC Holdings Inc., Columbia Hosp. Corp. of Bay Area, Columbia Hospital Corporation of Corpus Christi.

F. Van Huseman, White Huseman & Pletcher, Corpus Christi, TX, for Corpus Christi Bay Area Surgery Ltd.

### *MEMORANDUM AND ORDER*

HARMON, District Judge.

Pending before the Court are defendant Corpus Christi Bay Area Surgery, Ltd.'s ("CBAS") Motion to Dismiss (Instrument # 45) and defendants Columbia/HCA Healthcare Corporation, CHC Holdings, Inc., Columbia Hospital Corporation of Bay Area, Columbia Hospital Corporation of Corpus Christi, and Columbia Surgicare Specialty Hospital's (collectively "the Columbia defendants") Motion to Dismiss Plaintiff's Second Amended Complaint (Instrument # 61). CBAS's motion to dismiss concerns the same issues that are presented in the Columbia defendants' motion to dismiss, as well as an additional two issues related solely to CBAS. Since the Court's consideration of the Columbia defendants' motion to dismiss is dispositive of the whole case, the Court does not need to consider the two remaining issues in CBAS's motion to dismiss. After considering the parties' submissions, the second amended complaint, the argument of counsel, and the relevant law, the Court concludes that the motions to dismiss should be **GRANTED.**

## Factual Background

Relator James M. Thompson, M.D. ("Thompson") brought this *qui tam*[1] action pursuant to the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* (West Supp.1996), predicated on alleged violations of the Medicare anti-kickback statute, 42 U.S.C. § 1320a–7b (West 1991), and the Stark laws, 42 U.S.C. § 1395nn (West 1992 & Supp.1996), which relate to physicians' referrals of Medicare patients. The government has declined to proceed with this case under 31 U.S.C. § 3730 (West Supp.1996). Therefore, Thompson is pursuing this case with his own counsel on behalf of the government.

Thompson is a medical doctor who engages in private practice in Corpus Christi, Texas. Columbia/HCA Healthcare Corporation ("Columbia/HCA") has owned or controlled, directly or through subsidiary corporations or affiliated corporations, partnerships, and other business entities, various healthcare providers throughout the United States since 1988 and in Corpus Christi since 1990. CHC Holdings, Inc. is a subsidiary of Columbia/HCA. Columbia Hospital Corporation of Bay Area ("CHC–Bay Area") is a subsidiary of Columbia/HCA and is the general partner of Bay Area Healthcare Group, Ltd. which is the owner and operator of several hospitals in Corpus Christi. Columbia Hospital Corporation of Corpus Christi is a subsidiary of Columbia/HCA and the general partner of Corpus Christi Imaging, Ltd. Columbia Surgicare Specialty Hospital is an outpatient hospital located in Corpus Christi. CBAS is the owner and operator of Corpus Christi Bay Area Surgery, an outpatient surgical facility located on the premises of Bay Area Medical Center in Corpus Christi which is operated by a subsidiary of Columbia/HCA.

Thompson contends that the defendants have created investment arrangements and provided financial inducements to physicians for patient referrals in violation of the Medicare anti-kickback statute and Stark laws which has resulted in violations of the FCA. The following is a list of prohibited induce-ments and financial arrangements which Thompson has alleged:

(1) Offering physicians in a position to refer patients an exclusive opportunity not available to other qualified investors to invest in "partnerships" to own defendants' hospitals, and receive profits therefrom;

(2) Offering loans or providing assistance in obtaining bank loans to invest in these "partnerships;"

(3) Repayment of capital investments disguised as "consultation fees;"

(4) Free and below market rent for offices near defendants' hospitals;

(5) Expense-paid vacations and educational opportunities for physicians and medical technicians in a position to refer patients;

(6) Payments to physicians and medical technicians in positions to influence referrals based on the number or amount of patient-days used, or procedures scheduled;

(7) Creating lucrative financial arrangements with physician-owned entities which induce physicians to practice at defendants' hospitals;

(8) Making payments to physicians and physicians' groups in the form of "rent" for vacant space, or space "rented" at an excessive rate;

(9) Forgiveness of the cost of above-standard leasehold improvements to space occupied by physicians in defendants' Medical Office Building;

(10) Income guarantees to physicians who agree to practice at the defendants' hospitals.

Thompson contends that these alleged inducements and relationships constitute violations of 42 U.S.C. § 1395nn and 42 U.S.C. § 1320a–7b, which in turn leads to violations of the FCA when the defendants seek Medicare reimbursement. Additionally, Thompson alleges that the defendants have filed false certifications with Medicare which rendered all of the defendants' claims under Medicare false or fraudulent. Thompson

---

**1.** The term *"qui tam"* is short for *"qui tam pro domino rege quam pro se imposo sequitur,"* which is interpreted as "who brings the action as well for the king as for himself." *United States ex rel.* *Kelly v. Boeing Co.,* 9 F.3d 743, 746 n. 3 (9th Cir.1993), *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994).

also alleges that the defendants have filed claims for services which were not medically necessary. The defendants have fairly categorized Thompson's claims into three groups: (1) the alleged violations of the Medicare referral laws rendered all of the Medicare claims submitted by the defendants to be false or fraudulent under the FCA; (2) the defendants' submissions of specific forms to the government which contained false certifications qualified as fraudulent claims under the FCA; and (3) a certain percentage of the Medicare claims submitted by the defendants were for services that were not medically necessary. The defendants have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) arguing, *inter alia*, that violations of the Medicare referrals laws do not support a claim under the FCA and Thompson has not alleged supportable claims that some of the services rendered were not medically necessary.

### Rule 12(b)(6) Standard

■ Federal Rule of Civil Procedure 12(b) provides that cases can be dismissed for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Furthermore, if a motion asserting such a defense is presented along with matters outside the pleadings, the motion is to be treated as a motion for summary judgment under Rule 56, and the parties are to be given a reasonable opportunity to present all material pertinent to a motion for summary judgment. Fed.R.Civ.P. 12(b). Motions to dismiss for failure to state a claim are viewed with disfavor and are rarely granted. *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). The Court is to accept the facts pleaded by the plaintiff as true and is to construe the complaint liberally. *Id.* Additionally, a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). However, the Court is not required to accept conclusory allegations in the complaint as true. *Kaiser,* 677 F.2d at 1050. The Court

is also to dismiss any claim that on its face is barred by an affirmative defense. *Id.*

### FCA Claims Predicated on Violations of Medicare Laws

■ The basis of Thompson's case is that the defendants have filed Medicare claims with the government in violation of the FCA. The relevant portion of the FCA provides that:

(a) Liability for certain acts.—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

. . . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person, . . . .

31 U.S.C.A. § 3729 (West Supp.1996). In order to state a claim under the FCA, a plaintiff must show that (1) the defendant presented to the government a claim for payment; (2) the claim was false or fraudulent; (3) the defendant knew the claim was false; and (4) the government suffered damages as a result of the false or fraudulent claim. *Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1043 (Fed.Cir.1994) (citation omitted). The defendants concede that the submission of false claims to Medicare would support a cause of action but contend that Thompson has not pled any acts by the defendants which constitute the submission of false or fraudulent claims. The defendants' argument is essentially that even if the defendants have violated the anti-kickback laws or Stark laws the government would have paid the Medicare claims since there is no allegation that the services rendered were not medically necessary or otherwise false or fraudulent. In other words, the defendants maintain that even if the alleged

kickbacks and prohibited financial relationships might cause a doctor to refer a patient to one hospital rather than another, that does not mean that the services rendered to the patient were unnecessary or that the resulting Medicare claim was false or fraudulent. Thompson, however, contends that the defendants violated the FCA by fraudulently concealing their illegal actions under the anti-kickback statute and Stark laws by filing false certificates of compliance with the statutes and billing the government for the services even though the services were rendered in violation of the Medicare statutes.

The Medicare anti-kickback statute prohibits (1) the solicitation of renumeration in return for referrals of Medicare patients, and (2) the offer or payment of renumeration to induce such referrals. 42 U.S.C.A. § 1320a–7b (West 1991). While the anti-kickback statute and related regulations provide certain exceptions and "safe-harbors," the applicability of these are not at issue in the instant motions to dismiss. *See, e.g.,* 42 U.S.C. § 1320a–7b(b)(3) (statutory exceptions); 42 C.F.R. § 1001.952 (safe harbor regulations).

■ The first Stark law was enacted by Congress in 1989 and became effective in 1992. The initial Stark law, commonly referred to as "Stark I," prohibited doctors from referring Medicare patients to an entity for **clinical laboratory services** if the referring doctor had a non-exempt "financial relationship" with such entity. 42 U.S.C.A. § 1395nn (West 1992). The Stark laws define a "financial relationship" as a doctor's (1) ownership or investment interests in the entity, or (2) a compensation arrangement with the entity, subject to certain statutory exceptions. 42 U.S.C.A. § 1395nn(a)(2) (West 1992 & Supp.1996). Under Stark I, financial relationships between doctors and hospitals were largely excluded from the scope of the statute. 42 U.S.C.A. §§ 1395nn(b)(4) (excluding financial arrangements with hospitals unrelated to clinical laboratory services) and (d)(3) (excluding ownership or investment interests in hospitals) (West 1992). In 1995, Congress amended the statute, which is now referred to as Stark II, to expand the scope of "designated health services" for which referrals are prohibited from clinical laboratory

services to include, *inter alia,* hospital inpatient and outpatient services. 42 U.S.C.A. §§ 1395nn(a)(1) and (h)(6) (West Supp.1996). Since Thompson's claims concern events starting in 1990, both Stark I and Stark II will be applicable in this action.

■ The main issue for resolution is whether Medicare claims filed for services which were rendered in violation of the anti-kickback statute and/or Stark laws are *a fortiori* false claims under the FCA. The defendants rely on *United States v. Shaw,* 725 F.Supp. 896 (S.D.Miss.1989), and *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456 (5th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978), in support of their contention that no FCA claim exists if the government is not required to pay out more on a claim than it would have but for the alleged fraud. In response to the defendants' motions to dismiss, Thompson claims that several cases support his position that violations of other statutes can support a claim under the FCA. Thompson cites, among others, *Ab–Tech Constr., Inc. v. United States,* 31 Fed.Cl. 429 (1994), *aff'd,* 57 F.3d 1084 (Fed.Cir.1995); *Peterson v. Weinberger,* 508 F.2d 45 (5th Cir.1975), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975); *United States ex rel. Pogue v. American Healthcorp, Inc.,* 914 F.Supp. 1507 (M.D.Tenn.1996); and *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419 (E.D.N.Y.1995).

In *Shaw,* the defendant had previously been convicted for bribery in connection with applications for housing loans. In the civil action, the government contended that the bribery scheme corrupted the loan process and caused the loan applications to be false or fraudulent claims because the applications included the implicit false representation that they were free of corruption. *Shaw,* 725 F.Supp. at 900. In rejecting the government's claim, the district court stated that the bare fact that bribes were involved in the case did not necessarily lead to the conclusion that false or fraudulent claims were made in connection with each of the loan applications or preapplications. *Id.*

In *Equifax,* the defendant was a corporation in the business of collecting and provid-

ing information for business decisions. *Equifax,* 557 F.2d at 459. At times, agencies of the United States contracted with Equifax to gather information on prospective employees. *Id.* In collecting such information, Equifax allegedly employed detective-like agencies, which was a violation of the Anti–Pinkerton Act. *Id.* The Fifth Circuit construed the claims against Equifax to be "that Equifax misrepresented its qualification for government employment and thus made a false claim." *Id.* at 461.

In discussing the FCA, the Fifth Circuit recited that, "The False Claims Act 'was not designed to reach every kind of fraud practiced on the Government.'" *Id.* at 460 (quoting *United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 952–53, 2 L.Ed.2d 1001 (1958)). "The statute is primarily directed against government contractors' billing for nonexistent or worthless goods or charging exorbitant prices for delivered goods." *Equifax,* 557 F.2d at 460 (quoting *McNinch,* 356 U.S. at 599, 78 S.Ct. at 952–53). The Fifth Circuit stated that to establish that Equifax committed fraud under the FCA, the plaintiff must demonstrate that the government was misled by Equifax's application for the reporting business. *Equifax,* 557 F.2d at 461. "Unless the government made it clear that it would not employ detective agencies when it contracted for the work, Equifax's application did not make a material misrepresentation, did not mislead the government, and did not defraud the government within the meaning of the False Claims Act." *Id.* "[T]he False Claims Act is not an enforcement device for the Anti–Pinkerton Act."

The defendants contend that these two cases are consistent with their position that no FCA claim exists when the government is not required to pay more than it would have paid except for the fraud. *United States v. Azzarelli Constr. Co.,* 647 F.2d 757, 762 (7th Cir.1981).

The most recent case on this issue, however, is *United States ex rel. Pogue v. American Healthcorp, Inc.,* 914 F.Supp. 1507 (M.D.Tenn.1996). *Pogue* is similar to the

instant case. It is a *qui tam* action brought under the FCA by a former employee against several healthcare providers [2] for violations of the Medicare anti-kickback and self-referral statutes. The *Pogue* defendants filed a motion to dismiss for failure to state a claim which was initially granted by the district court. *See United States ex rel. Pogue v. American Healthcorp, Inc.,* No. 3–94–0515, 1995 WL 626514 (M.D.Tenn. Sept. 14, 1995). The district court, however, granted the plaintiff's motion to reconsider and vacated the September 14, 1995 order. *Pogue,* 914 F.Supp. 1507. In granting the plaintiff's motion to reconsider, the district court noted that, "A recent trend of cases appears to support Pogue's proposition that a violation of Medicare anti-kickback and self-referral laws constitutes a violation of the False Claims Act." *Id.* at 1509. Based upon its review of the legislative history of the FCA, the district court concluded that "the False Claims Act was intended to govern not only fraudulent acts that create a loss to the government but also those fraudulent acts that cause the government to pay out sums of money to claimants it did not intend to benefit," *Id.*

The *Ab–Tech* case involved an FCA claim against a plaintiff who had entered into a financial arrangement with a non-minority-owned enterprise without getting approval from the Small Business Administration ("SBA"), as the plaintiff was required to do as a participant in the SBA program. The government contended that the plaintiff had violated the FCA by submitting payment vouchers for services. The Federal Claims Court held that "[t]he payment vouchers represented an implied certification by [the plaintiff] of its continuing adherence to the requirements for participation in the [SBA] program." *Ab–Tech,* 31 Fed.Cl. at 434. The Claims Court stated that:

> [B]y deliberately withholding from SBA knowledge of the prohibited contract arrangement with [the unapproved entity], [the plaintiff] not only dishonored the terms of its agreement with that agency

---

**2.** It appears from the record that the defendants in *Pogue* are in some way related to some of the

defendants in the instant case.

but, more importantly, caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the [SBA] program. In short, the Government was duped by [the plaintiff's] active concealment of a fact vital to the integrity of that program. The withholding of such information—information critical to the decision to pay—is the essence of a false claim.

*Id.*

The *United States v. Incorporated Village of Island Park* case involved an FCA claim against defendants who had violated Housing and Urban Development regulations by obtaining grant funds from the government and falsely stating that persons would not be excluded from the defendants' program on the basis of race. *Island Park*, 888 F.Supp. at 440. The district court in *Island Park* noted that the FCA's legislative history indicates that it was intended to cover "each and every claim submitted ... by means of false statements, or other corrupt or fraudulent conduct, or in violation of any statutes or applicable regulations...." *Id.* at 439.

Thompson also relies upon the Fifth Circuit's language in *Peterson* that "[a] claim is within the purview of the False Claims Act if it is grounded in fraud which might result in financial loss to the Government. Simply stated: 'This remedial statute reaches beyond "claims" which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money.'" *Peterson*, 508 F.2d at 52 (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1968)). In *Peterson*, FCA claims were permitted against a doctor who signed Medicare claim forms which certified that services had been performed by the doctor or under his supervision when in actuality the services had not been rendered by the doctor or under his supervision. *Id.* at 52. The doctor argued that the FCA was not violated because the services were performed by qualified people, the patients receiving the services were entitled to them under Medicare, there was no financial loss to the government, and the monies paid by the government were therefore a liability which the government was obligated to pay. *Id.* The Fifth Circuit concluded that since the services for which claims were filed were not performed by the doctor or under his supervision, "the services billed were plainly not 'covered' services, and the Government thus paid on the basis of the false claims presented." *Id.* "Obviously, a false certification [by the doctor] on the claim form frustrated the Government's attempt to process only valid claims and led to the payment for services which were not covered or payable...." *Id.*

*Peterson* is different from the instant case, however, because the services rendered in *Peterson* were not services for which reimbursement from Medicare was allowed. In the instant case, the services rendered were services covered by Medicare.[3] Therefore, *Peterson* clearly involved false Medicare claims, while the instant case does not.

In *Equifax*, the Fifth Circuit held that there is no indication that the FCA is intended to be used as a private enforcement device for the Anti–Pinkerton Act. By the same reasoning, the FCA would not be intended to be used as a private enforcement device for the Medicare Anti–Kickback statute and Stark laws. Despite the rash of district court decisions outside the Fifth Circuit that hold to the contrary, this Court must follow Fifth Circuit law that still requires that a claim itself be false or fraudulent in order for liability under the FCA to exist. Thompson has not stated a claim unless he has sufficiently alleged that the defendants have submitted claims that are false or fraudulent (*i.e.*, claims or claim amounts that the government would not have had to pay but for the fraud). Allegations that medical services were rendered in violation of Medicare anti-fraud statutes do not, by themselves, state a claim for relief under the FCA.

---

**3.** Thompson has alleged that some of the claims filed by the defendants were for services which were not medically necessary. As discussed *infra*, Thompson's claim based on the services not being medically necessary are to be dismissed for failure to comply with the pleading requirements for fraud under Fed.R.Civ.P. 9(b). Consequently, Thompson's case does not include allegations that the services rendered were not proper.

### FCA Claims Predicated on False Certifications

Thompson has asserted that the Health Care Financing Administration ("HCFA") Form 2552s which were filed by the defendants contained fraudulent certifications. The HCFA Form 2552, which is filed by hospitals which participate in the Medicare program, contains a notice which states that:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative fines and/or imprisonment may result.

Thompson claims that the compliance certificate also requires the hospital administrator to execute a statement certifying that he is familiar with the laws and regulations regarding the provision of healthcare services and that the services identified in the cost report were provided in compliance with the anti-fraud statute. Thompson contends that the defendants filed false certifications which enabled them to participate in the Medicare program when they were not legally entitled to because of their violations of the Medicare anti-fraud statutes.

■ The defendants maintain that even if the certifications were false due to violations of the anti-kickback statute or Stark laws, there is not a violation of the FCA since the cost reports themselves are not false or fraudulent claims. In other words, the defendants believe that the filing of a false certification does not, standing alone, support a claim under the FCA—the false certification does not render the related claims false or fraudulent. The defendants cite a Florida district court case to support their position that a false statement is not coterminous with a false claim. *United States v. Hill,* 676 F.Supp. 1158, 1174 (N.D.Fl.1987). Thompson, however, has cited *United States v. Oakwood Downriver Med. Ctr.,* 687 F.Supp. 302 (E.D.Mich.1988), which indicates that false HCFA 2552 certifications are a proper basis for liability under the FCA. Since the Court has already concluded that liability under the FCA requires that the claims themselves be false or fraudulent, false statements in the HCFA 2552 certifications do not render the claims false, as well.

### Federal Rule of Civil Procedure 9(b)

In his Second Amended Complaint, Thompson has alleged that due to the kickbacks provided by the defendants and the prohibited financial relationships between the defendants and various doctors, claims have been submitted to the government for services that were not medically necessary. This is the only allegation by Thompson which asserts that the defendants' claims were actually false or fraudulent. The defendants have sought to have Thompson's claims dismissed since the only support he has provided for this allegation is a statistical study which concluded that forty percent of the services rendered by the payor of kickbacks are for services which are not medically necessary. The defendants' argument on this issue relates to the pleading requirements of Federal Rule of Civil Procedure 9(b).

■ Rule 9(b) imposes a heightened pleading requirement for allegations of fraud. The rule provides that averments of fraud shall be stated "with particularity." Fed. R.Civ.P. 9(b). According to the Fifth Circuit, "[a]t a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir.1993). Federal Rule of Civil Procedure 9(b) permits, however, allegations about conditions of the mind, such as the defendant's knowledge of the truth and intent to deceive, to be pled generally. *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992). Dismissal for failure to plead fraud with particularity under Rule 9(b) is considered a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996).

Because a determination of adequate "particularity" depends on the facts of each case, the Fifth Circuit "has never articulated the requirements of Rule 9(b) in great detail." *Shushany*, 992 F.2d at 521. The defendants argue that Thompson's Second Amended Complaint fails (1) to plead any facts that would render Columbia/HCA or CHC Holdings liable under the FCA, (2) to identify any specific Medicare claims or describe the way in which they were purportedly false or fraudulent, (3) to plead any facts at all regarding any Columbia-affiliated facilities other than the Corpus Christi hospitals, or (4) to plead specific facts regarding the alleged incentives paid to doctors for referrals to the Bayview Psychiatric Hospital.

■ With respect to Thompson's contention that the defendants violated the FCA by filing claims for services which were not medically necessary, the Court finds that Thompson has not satisfied the requirements of Rule 9(b). Thompson has alleged that:

> In reasonable probability, based upon statistical studies performed by the Government and others, a substantial percentage of the Medicare claims presented based on services rendered by physicians who
>
> > (1) had received financial inducements to refer patients to Defendants' healthcare providers, or
> >
> > (2) were in prohibited financial relationships with the Defendants' healthcare providers,
>
> were for services not medically necessary. Plaintiff alleges that, in reasonable probability, approximately 40% of such claims were for services not medically necessary.

Instrument # 29 at ¶ 160. The defendants argue that Thompson's reliance on governmental statistics does not take the place of specific allegations regarding the submission of claims for services that were not medically necessary by the defendants in this case. Thompson has not met his pleading burden with respect to his allegation that the FCA was violated due to the submission of claims for services that were not medically necessary since he has not alleged that any specific physicians referred patients for such services or that any specific claims were filed for such services. Thompson did not assert that the defendants were submitting claims for services which were not medically necessary until the filing of his Second Amended Complaint, which was after the defendants filed their initial motions to dismiss. So while leave could be granted for Thompson to replead in compliance with Rule 9(b), the Court declines to do so since this allegation appears to be a last minute effort by Thompson to otherwise avoid dismissal of the case based on the statutory violations of Medicare. Consequently, Thompson's claims based on the submission of Medicare claims for services which were not medically necessary should be dismissed.

### Conclusion

In accordance with the foregoing, Thompson's claims under the FCA based on violations of the Medicare anti-fraud statutes and the filing of false HCFA Form 2552s should be dismissed for failure to state a claim and Thompson's claims based on the submission of claims for services which were not medically necessary should be dismissed for failure to state a claim since Thompson has failed to comply with the pleading requirements of Fed.R.Civ.P. 9(b). Accordingly, the Court hereby

**ORDERS** that the defendants' motions to dismiss are **GRANTED**.