UNITED STATES of America ex rel. David P. WEINBERGER, and David P. Weinberger, Esq., Individually, Plaintiffs-Appellants,

v.

EQUIFAX, INC. (formerly Retail Credit Company), Defendant-Appellee.

No. 75–3491.

United States Court of Appeals,
Fifth Circuit.

Aug. 12, 1977.

Rehearing and Rehearing En Banc
Denied Oct. 4, 1977.

David P. Weinberger, pro se.

Robert W. Rust, U. S. Atty., Miami, Fla., Edward H. Levi, Atty. Gen., Dept. of Justice, Washington, D. C., for plaintiffs-appellants.

Paul M. Stokes, Miami, Fla., for defendant-appellee.

Before WISDOM and GEE, Circuit Judges, and BOOTLE,* District Judge.

* Senior District Judge of the Middle District of Georgia sitting by designation.

1. An individual employed by the Pinkerton Detective Agency, or similar organizations, may not be employed by the government of the United States or the government of the District of Columbia.
5 U.S.C. § 3108 (1970).

2. § 231. Liability of persons making false claims

Any person . . . who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, . . . . .

\* \* \* \* \* \*

§ 232. Same; suits; procedure
(A) The several district courts of the United States, the several district courts of the Territories of the United States, within whose jurisdictional limits the person doing or committing such act shall be found, shall wheresoever such act may have been done or committed, have full power and jurisdiction to hear, try, and determine such suit.
(B) Except as hereinafter provided, such suit may be brought and carried on by any person, as well for himself as for the United

GEE, Circuit Judge:

In this appeal we review the district court's dismissal of plaintiff Weinberger's action, pursuant to Federal Rule 12(b)(6), for lack of standing and failure to state a claim. By his suit, Weinberger sought a declaratory judgment that government employment of Equifax, Inc. (formerly Retail Credit Co.) to provide information on prospective government employees violated the Anti-Pinkerton Act, 5 U.S.C. § 3108 (1970).[1] Weinberger also alleged that Equifax's billing of the United States for services performed violated the False Claims Act, 31 U.S.C. §§ 231–32 (1970),[2] asserting that

States, the same shall be at the sole cost and charge of such person, and shall be in the name of the United States, but shall not be withdrawn or discontinued without the consent, in writing, of the judge of the court and the United States attorney, first filed in the case, setting forth their reasons for such consent.
(C) Whenever any such suit shall be brought by any person under clause (B) of this section notice of the pendency of such suit shall be given to the United States by serving upon the United States attorney for the district in which such suit shall have been brought a copy of the bill of complaint and by sending, by registered mail, or by certified mail, to the Attorney General of the United States at Washington, District of Columbia, a copy of such bill together with a disclosure in writing of substantially all evidence and information in his possession material to the effective prosecution of such suit. The United States shall have sixty days, after service as above provided, within which to enter appearance in such suit. If the United States shall fail, or decline in writing to the court, during said period of sixty days to enter any such suit, such person may carry on such suit. If the United States within said period shall enter appearance in such suit the same shall be carried on solely by the United States. In carrying on such suit the United States shall not be bound by any action taken by the person who brought it, and may proceed in all respects as if it were instituting the suit: Provided, That if the United States shall fail to carry on such suit with due diligence within a period of six months from the date of its appearance therein, or within such additional time as the court after notice may allow, such suit may be carried on by the person bringing the same in accordance with clause (B) of this section. The court shall have no jurisdiction to proceed with any such suit brought under clause (B) of this

Equifax's billing of the United States for services performed in violation of the Anti-Pinkerton Act was a false claim. The district court dismissed the action, ruling that Weinberger had failed to allege essential facts under both actions and that, in any case, Weinberger lacked standing to bring either. Weinberger appeals these determinations and further asserts that the district judge should have stood recused.

The villain in Weinberger's scenario is Equifax, a corporation in the business of collecting and providing information for business decisions. Equifax's credit-reporting activities qualify it as a consumer reporting agency under the Fair Credit Reporting Act. *See* 15 U.S.C. § 1681a(f) (1970), but it also furnishes information concerning prospective customers and employees to businesses. On occasion, agencies of the United States have contracted with Equifax to gather information on prospective employees. Weinberger alleges that in collecting information, Equifax does not confine itself to examinations of files and public records; in some cases it uses investigative techniques similar to those employed by detective agencies. These alleged investigative techniques sparked this lawsuit.

In his action seeking a judgment declaratory of 5 U.S.C. § 3108, Weinberger asserts that because Equifax employs detective-like investigative techniques, it is an organization "similar" to the Pinkerton Detective Agency and thus barred from government employment by the Anti-Pinkerton Act. Weinberger lacks standing to assert this claim. To have standing, Weinberger must assert a personal stake in the outcome "warranting *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Under *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), standing turns on "whether the plaintiff alleges that the challenged action has

section or pending suit brought under this section whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought: *Provided, however,* That no abatement shall be had as to a suit pending on December 23, 1943, if before such suit was filed such person had in his possession and voluntarily disclosed to the Attorney General substantial evidence and information which was not theretofore in the possession of the Department of Justice.

(D) In any suit whether or not on appeal pending on December 23, 1943, brought under this section, the court in which such suit is pending shall stay all further proceedings, and shall forthwith cause written notice, by registered mail, or by certified mail, to be given the Attorney General that such suit is pending, and the Attorney General shall have sixty days from the date of such notice to appear and carry on such suit in accordance with clause (C) of this section.

(E) (1) In any such suit, if carried on by the United States as herein provided, the court may award to the person who brought such suit, out of the proceeds of such suit or any settlement of any claim involved therein, which shall be collected, an amount which in the judgment of the court is fair and reasonable compensation to such person for disclosure of the information or evidence not in the possession of the United States when such suit was brought. Any such award shall in no event exceed one-tenth of the proceeds of such suit or any settlement thereof.

(2) In any such suit when not carried on by the United States as herein provided, whether heretofore or hereafter brought, the court may award to the person who brought such suit and prosecuted it to final judgment, or to settlement, as provided in clause (B) of this section, out of the proceeds of such suit or any settlement of any claim involved therein, which shall be collected, an amount, not in excess of one-fourth of the proceeds of such suit or any settlement thereof, which in the judgment of the court is fair and reasonable compensation to such person for the collection of any forfeiture and damages; and such person shall be entitled to receive to his own use such reasonable expenses as the court shall find to have been necessarily incurred and all costs the court may award against the defendant, to be allowed and taxed according to any provision of law or rule of court in force, or that shall be in force in suits between private parties in said court: *Provided,* That such person shall be liable for all costs incurred by himself in such case and shall have no claim therefor on the United States.

caused him injury in fact, economic or otherwise . . . ," *id.* at 152, 90 S.Ct. at 829, and whether "the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question." Weinberger fails to satisfy the first requirement because he has alleged no injury in fact.[3]

Weinberger's *qui tam* action under the False Claims Act, however, fares somewhat better here than it did in the district court. The district court ruled that Weinberger lacked standing to assert his informer's suit, that he had failed to comply with procedural requirements of the Act, and that he had failed to state a claim under the Act. We hold that Weinberger had standing under the False Claims Act and properly pursued the action, but we agree with the district court that he failed to state a claim under the Act.

In 31 U.S.C. § 232 (1970), Congress specifically provides for informer's suits. It grants informers standing to sue and an award for successful action under the statute. *See* 31 U.S.C. § 232(B) and (E)(2) (1970). To maintain the action the informer is required only to notify the United States of the suit. The United States may then choose whether to join the action. If it elects not to enter an appearance, the informer's suit may continue. *See* 31 U.S.C. § 232(C) (1970). A jurisdictional requirement of the informer's suit is that it must rest on information not in the possession of the United States prior to filing the action. *See* 31 U.S.C. § 232(C) (1970). None of these procedural requirements doom Weinberger's action.

■ After Weinberger filed his informer's action, he notified the United States of his suit. And though the United States elected not to join, his action was not affected by this. *See* 31 U.S.C. § 232(C) (1970). The statute clearly accords him standing to bring the action so long as he predicates his claim on information not in the possession of the United States at the time of his suit. *Id.* At no time has Equifax suggested that the information essential to Weinberger's suit was already in the possession of the government. The district court erred in holding that Weinberger lacked standing and had failed to meet procedural requirements.

■ Nevertheless, Weinberger still fails to state a claim under the False Claims Act. That Act prohibits false or fraudulent claims to government payment. The penal nature of the statute requires careful scrutiny to see if the alleged misconduct violates the statute. *See United States ex rel. Marcus v. Hess,* 317 U.S. 537, 542, 63 S.Ct. 379, 87 L.Ed. 443 (1943). The False Claims Act "was not designed to reach every kind of fraud practiced on the Government." *United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). The statute is primarily directed against government contractors' billing for nonexistent or worthless goods or charging exorbitant prices for delivered goods. *Id.* Equifax plainly did not submit a false claim under this reading of the statute: no one has suggested that Equifax's reporting activities for the government were not properly carried out. Weinberger has alleged no false claim in this sense.

**3.** Weinberger's complaint does state that at one time he applied to the United States Civil Service Commission for employment, that the Civil Service requested permission to conduct a background investigation on him in connection with the position of Assistant Appeals Officer, and that he gave his assent to that background investigation. It does not allege that Equifax was employed to conduct a background investigation on him or that he was injured in any way by the background investigation. Thus, Weinberger's only interest is one shared with other citizens that the government follow its laws, but this "generalized grievance" shared with other citizens does not confer standing or support the invocation of federal jurisdiction. *See Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. 2197. The personal interest he alleges is too tenuous and undifferentiated from the interests of others to afford him standing. Of course, the fact that Weinberger seeks a declaratory judgment action provides no jurisdictional help if he lacks standing to seek any sort of relief. *See Red Lobster Inns of America, Inc. v. New England Oyster House, Inc.,* 524 F.2d 968, 969 (5th Cir. 1975) (per curiam); 10 C. Wright & A. Miller, Federal Practice & Procedure: Civil §§ 2766, 2767 (1973).

■ The statute also interdicts material misrepresentations made to qualify for government privileges or services. *See, e. g., Alperstein v. United States,* 291 F.2d 455, 456 (5th Cir. 1961) (per curiam) (veteran violated False Claims Act when, to qualify for federal benefits, he falsely swore that he was financially unable to bear medical expenses); *United States v. Johnson,* 138 F.Supp. 525, 527–28 (W.D.Okla.1956) (physician misrepresented competency and general qualifications to gain employment with Air Force). The principal thrust of Weinberger's allegations fall into this category: that Equifax misrepresented its qualification for government employment and thus made a false claim. But to establish that Equifax committed fraud in this manner, Weinberger first must demonstrate that the government was misled by Equifax's application for the reporting business. Unless the government made it clear that it would not employ detective agencies when it contracted for the work, Equifax's application did not make a material misrepresentation, did not mislead the government, and did not defraud the government within the meaning of the False Claims Act. Weinberger does not allege that the government required applicants to represent that they were not detective agencies; no misrepresentation is alleged. In this case the False Claims Act is not an enforcement device for the Anti-Pinkerton Act. Weinberger has failed to allege a claim under the False Claims Act.

Even had Weinberger alleged, however, that the government did make nondetective agency status a prerequisite to a reporting contract, Weinberger would still have failed to state a claim because we conclude that he has not alleged facts bringing Equifax under the proscriptions of the Anti-Pinkerton Act. Weinberger has not alleged facts indicating that Equifax operates like the Pinkerton Detective Agency did in 1892—*i. e.,* that it is a general detective agency, that it provides watchmen for plants and buildings, and that it offers for hire a mercenary, quasi-military armed force.

The Anti-Pinkerton Act is an expression of legislative frustration. In the 1890's, the nascent labor movement was increasingly involved in sometimes violent confrontations with factory owners over wages and working conditions. When the owners' resort to legal remedies proved fruitless or when the local police force was ineffectual in handling strikes, owners frequently engaged the Pinkerton Agency to supply large bodies of armed men to discourage strikers from interfering with the orderly operation of business. One particularly violent and bloody confrontation occurred in Homestead, Pennsylvania, when the Amalgamated Association of Iron and Steel Workers struck a Carnegie Steel Mill. Managers of the mill employed an armed force of 300 Pinkertons to protect the mill. As the Pinkertons approached the mill, floating on barges down the Monongahela River, a firefight ensued between them and strikers on the banks. Numerous injuries and some deaths resulted from this struggle. The Homestead incident prompted congressional investigations on ways to prevent employers' reliance on Pinkertons to solve labor disputes. *See* S. Rep. No. 1280, 52d Cong., 2d Sess. (1893); H. Rep. No. 2447, 52d Cong., 2d Sess. (1893). Although Congress wished to ban the employment of Pinkertons as a private mercenary force, it concluded that it lacked the power to enact such a ban and looked to the states to control Pinkerton conduct. *See* H. Rep. No. 2447, 52d Cong., 2d Sess., p. XVI (1893).

But it did feel empowered to do something. Simultaneously with its investigation of the Pinkertons, Congress was discussing the 1892 civil appropriations bill. Representative O'Neill of Missouri offered an amendment to prevent the government from contracting with entities that employed "Pinkerton detectives or any other association of men as armed guards" and to prevent the government itself from employing the Pinkerton Detective Agency or any similar agency. When the Senate refused to accept the amendment, viewing the first proscription as too broad, the conference committee deleted it but retained a reword-

ed version of the second provision in the 1892 bill. The proscription would have expired with that appropriations bill, but in 1893 Congress made the restriction permanent.[4]

■ The district court, after reviewing the legislative history, concluded that the Anti-Pinkerton Act prohibited only government use of detectives during labor disputes. Although it is true that the impetus for the Anti-Pinkerton Act arose from the employment of armed guards in labor disputes, the congressional enactment banning Pinkerton employment must be read more broadly. Congress clearly generally intended to prohibit employment by the government of the Pinkerton Agency as then constituted, or any similar agency. In this sense, the district court erred in its restrictive interpretation of the Anti-Pinkerton Act.

Weinberger urges that Equifax is an organization similar to the Pinkerton Detective Agency, but his allegations fall short of those required by the Act. Weinberger alleges that Equifax operates like a detective agency and that it even considers the present-day Pinkerton Agency a competitor. Yet the nature of the statute directs us, not to the present-day Pinkerton Agency for comparison, but to the agency as it existed in 1892. Congress enacted a broad proscription against government employment of a class. Rather than specifically defining the class, it used one example by which others falling in the class could be identified. We cannot change that definition by looking to the example organization as it presently exists.[5] We must look to the Pinkerton Detective Agency *as it existed* when Congress used it as a definitional example in 1892 to decide which organizations are "similar" to the kind proscribed for employment.

The purpose of the Act and the legislative history reveal that an organization was "similar" to the Pinkerton Detective Agency only if it offered for hire mercenary, quasi-military forces as strikebreakers and armed guards. It had the secondary effect of deterring any other organization from providing such services lest it be branded a "similar organization." The legislative history supports this view and no other.

In investigating the Homestead incident, the Senate Report clearly distinguished between types of detective agencies:

> Some of them confine their operations to detective business, others furnish patrolmen to protect private property during the night, acting in harmony with the police force, while a few of them add to that kind of work the business of supplying armed men on occasions of strikes . . . ..

S. Rep. No. 1280, p. II (Feb. 10, 1893). In his amendment to the 1892 appropriations act, Representative O'Neill urged the language "Pinkerton detectives or any other association of men as armed guards" in his proposed prohibition of the employment of government contractors that used Pinkertons. It is true, as Weinberger argues, that this portion of O'Neill's amendment was disapproved by the Congress, but only because of its fear that the prohibition was too broad, not because of its more specific reference to the "armed guard" aspect of the Pinkerton Agency's activities. In fact, the explanation for Congress' action on this matter given by the ranking member of the House Conference Committee, Representative Holman, provides further support for our reading:

> [T]he original proposition adopted by the House was a very broad one. It not only prohibited the employment of the *Pinkerton force or any similar quasi-military*

---

4. Our description of congressional action surrounding the passage of the Anti-Pinkerton Act is derived from S. Rep. No. 447, 88th Cong., 1st Sess. (1963), a report on a bill to repeal the Anti-Pinkerton Act.

5. Such a construction, for example, would ban employment by the government of any organization furnishing, say, babysitting services, if Pinkerton had changed its business purpose to this at the relevant time. Or, had the Pinkerton Agency gone out of existence, it might be thought to ban employment of defunct organizations only.

*organization* by any officer of the Government or the District of Columbia, but it prohibited the employment of such force by any individual, firm, or corporation having contracts with the United States.

S. Rep. No. 447, 88th Cong., 1st Sess. (Aug. 20, 1963) (including description of 1893 conference) (emphasis supplied). Representative O'Neill's response to Mr. Holman further highlights the intent of the congressional originator of the Anti-Pinkerton Act:

> [D]oes not the gentleman from Indiana (Mr. Holman) well know that *nobody objects to the legitimate use of Pinkerton detectives as such. It is their use as armed guards that is objected to,* and it is the sending of their armed guards from one state into another that is objected to
>
> . . ..

 In light of the purpose of the Act and its legislative history, we conclude that an organization is not "similar" to the (quondam) Pinkerton Detective Agency unless it offers quasi-military armed forces for hire. Because Weinberger fails to allege that Equifax provides so much as an armed guard,[6] much less an armed quasi-military unit, Equifax's employment is not illegal under the Anti-Pinkerton Act. Thus, Weinberger fails to state a false claim under the False Claims Act.

Weinberger also appeals the district judge's failure to stand recused after discovering that his son was an associate of the law firm representing Equifax. Weinberger reinforces the suggestion of partiality by alleging other supposed instances of bias or prejudice by the district judge. For example, Weinberger protests that the court entered an order of dismissal only four days after Equifax filed a motion to dismiss the amended complaint and before Weinberger could file a reply memorandum. Weinberger also complains of comments by the district judge denigrating plaintiff's complaint. In our view, however, the most serious claim is that the district judge's son was associated with the defendant's legal counsel.

 The current statute providing for disqualification of a judge for bias suggests that he "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), and that he must disqualify himself if he or his spouse or a "person within the third degree of relationship" is acting as a lawyer in the proceeding, 28 U.S.C. § 455(b)(5)(ii), or has a financial interest in the outcome of the proceeding, 28 U.S.C. § 455(b)(5)(iii). None of the provisions requiring recusal apply here. It is undisputed that the district judge's son did not actively participate in Equifax's defense. That the son's law firm participated in the proceeding does not mean that he was "acting as a lawyer in the proceeding." *See SCA Services, Inc. v. Morgan,* 557 F.2d 110 (7th Cir., 1977). That provision requires actual participation. The fears of judicial bias that might result from an offspring's active participation in a proceeding do not merit automatic disqualification of the law firm to which the relative belongs. The "financial interest" provision might apply if the district judge's son were a partner in the firm. But his status as an associate removes that fear. *See id.* His salary interest as an associate is too remote to fall under this "financial interest" prohibition.

Although none of these matters require disqualification, they are considerations

---

6. Weinberger invokes a long line of Comptroller General decisions holding that the Anti-Pinkerton Act bars the employment of any detective agency in any capacity. *See, e. g.,* 71 M.S.Comp.Dec. 488 (1914); 38 Comp.Gen. 881 (1959). These decisions resulted from the Comptroller's determination, in his executive capacity, that certain payments by disbursing officers would be passed or disallowed. These decisions do not have the force of administrative interpretations by agencies empowered by Congress to interpret statutes, and we are not bound by them. *See United States ex rel. Brookfield Construction Co. v. Stewart,* 234 F.Supp. 94, 99–100 (D.D.C.), *aff'd per curiam,* 119 U.S.App.D.C. 254, 339 F.2d 753 (1964). Although we respect the Comptroller's efforts, our reading of the statute and its legislative history leads us to a different conclusion.

that might move the district judge to examine "whether his impartiality might reasonably be questioned." He should determine whether a reasonable man would conclude that the district judge should recuse himself. *See Parrish v. Board of Commissioners,* 524 F.2d 98, 103 (5th Cir. 1975); *Davis v. Board of School Commissioners,* 517 F.2d 1044, 1052 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). The district judge examined Weinberger's assertions that recusal was appropriate but perceived no justification for removing himself. On appeal, we review the district judge's determination for abuse of discretion. *See Davis, supra* at 1052. We find no abuse here of the district judge's conclusion that his impartiality could not reasonably be questioned.

Thus, we conclude that the district court correctly determined that Weinberger lacked standing to assert a direct action for violation of the Anti-Pinkerton Act but erred in denying him standing under the False Claims Act. Nevertheless, Weinberger failed to state a claim under the False Claims Act for two reasons: first, even granting an Anti-Pinkerton Act violation, Weinberger's action based on that violation did not state a "false" claim; and second, Weinberger failed to allege facts bringing the defendant within the Anti-Pinkerton Act proscription and thus failed to form the basis for his false claim. Finally, the district judge did not abuse his discretion in declining to stand recused. The district court's order of dismissal is

AFFIRMED.