**UNITED STATES of America,**
**Plaintiff.**

v.

**INTERVEST CORP. and J. Steven**
**Nail, Defendants.**

**No. Civ.A. 3:98CV531BN.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Aug. 10, 1999.

J. Brad Pigott, John A. Meynardie, U.S. Attorney's Office, Jackson, MS, for U.S.

Michael T. Dawkins, Baker, Donelson, Bearman & Caldwell, Jackson, MS, for Defendants.

### OPINION AND ORDER

BARBOUR, District Judge.

This cause is before the Court on Defendants' Motion for Summary Judgment, Plaintiff's Motion to Dismiss Defendants' Counterclaim for Lack of Subject Matter Jurisdiction, and Plaintiff's Motion to Exclude Expert Testimony of Former HUD Employee James Tahash. Having considered the Motions, Responses, Rebuttals, supporting and opposing authority, and all attachments to each, the Court finds that the Motion to Dismiss Counterclaim is well taken and should be granted and the Motion for Summary Judgment is also well taken and should be granted. Because the Court is granting the Motion for Summary Judgment, the Court finds that the Motion to Exclude Expert Testimony of James Tahash is moot.

### I. Factual Background and Procedural History

The facts of this case are set forth in this Court's Opinion and Order dated January 27, 1999, which struck certain affirmative defenses asserted by Defendants. However, the Court will restate and elaborate upon these facts as necessary for the purposes of these Motions.

This case involves a claim asserted by the United States (the "Government") against Defendants under the False Claims Act, 31 U.S.C. § 3729 et seq., alleging that Defendants made false and fraudulent claims regarding the condition of apartment units owned by Defendants and subsidized by the United States Department of Housing and Urban Development ("HUD").

### A. General Background Regarding Section 8 Housing Programs

In the early 1980's, HUD initiated housing programs under Section 8 of the

United States Housing Act of 1937, as amended. 42 U.S.C. § 1437f ("Section 8"). According to the HUD handbook, the program created financial incentives for private investors to participate in the construction and operation of housing for low income families. Over the years, many different programs and subprograms have been authorized and funded under Section 8. All of the Section 8 programs subsidize the rent of low and very low income tenants. Each program is designed to provide "decent, safe, and sanitary" housing.

### B. History of Metro Manor Apartments

Metro Manor Apartments ("Metro Manor") is a low-income housing project with 148 units located in Jackson, Mississippi. Metro Manor was constructed in 1980 and 1981 with a loan insured by HUD, Defendant J. Stephen Nail formed Metro Manor, Ltd., a limited partnership (the "Owner" or "Partnership") to participate in the Section 8 program by constructing, owning and operating Metro Manor. Nail is the Managing General Partner of the Partnership. The general and limited partners invested over one million dollars to facilitate construction of the apartments. The balance of construction costs were financed by a HUD-insured, non-recourse forty year mortgage.

Prior to construction of Metro Manor, the Owner entered into an "Agreement to Enter Into a Housing Assistance Payments Contract" with the contract administrator of HUD, the Jackson Housing Authority ("JHA"). The Owner agreed to complete the construction of Metro Manor and JHA agreed to enter into a Housing Assistance Payments Contract ("HAP Contract") with the Owner if the apartments satisfied the Minimum Housing Property Standards for Housing ("MPS") of HUD. After it was completed, Metro Manor was inspected by HUD and was approved as having satisfied MPS.

Intervest manages Metro Manor. Nail is the sole owner, President, and Chief Executive Officer of Intervest. Nail owns all of the stock of Intervest. Intervest manages over 80 properties, including Metro Manor.

HUD insures the mortgage on Metro Manor under Section 221(d)(4) of the National Housing Act of 1934 (the "NHA"). 12 U.S.C. § 1715$l$(d)(4). The NHA requires that the Owner and HUD enter into a Regulatory Agreement.

The Regulatory Agreement provides for regulation of the property and its Owner by HUD. Under the Regulatory Agreement, the Owner can engage in no business other than owning and operating the Project. The books and records of the owner are audited annually and the audit report is sent to HUD. Any rent increase must be first approved by HUD. The Owner is required to use these rents to maintain the Project in "good repair and condition."

If the Owner violates the Regulatory Agreement, the Regulatory Agreement provides that HUD must give the Owner 30 days, or such further time as the Secretary determines is necessary, to correct the violation. If the violation is not corrected within the required time, HUD can ask the mortgagee to declare the owner in default on the mortgage.

### C. Rent Subsidies Under Section 8 and the Housing Assistance Payment Contract

In accordance with their Agreement to Enter Into a HAP Contract, after the construction on Metro Manor was completed, the Owner and JHA entered into a HAP contract. A HAP contract entitles the Owner to Housing Assistance Payments ("HAPs") for units under lease with low income families. HAPs cover the shortfall between the "contract rent" and the amount paid by the tenant. JHA establishes the "contract rent." Under an Annual Contributions Contract, HUD pro-

vides JHA with the money to make the HAPs.

In the HAP contract, HUD and JHA represent to the owner that JHA will pay HAPs to enable the families of Metro Manor "to lease Decent, Safe and Sanitary housing pursuant to Section 8 of the Act." Each month, Intervest or the Metro Manor site manager files an "Application for Housing Assistance Payments," commonly referred to as a "HAP voucher."

The HAP voucher identifies the applicable mortgage insurance and Section 8 contract pursuant to which the HAPs are made, as well as the tenants, tenant income, number of unoccupied units in the apartment building, contract rent of each unit, and amount of rent payable by each tenant. The HAP voucher also specifies the total amount of the HAP requested by the Owner.

At the bottom of the first page of the HAP voucher is an "Owner's Certification." The management agent certifies on behalf of the owner that the information supplied has been properly computed in accordance with the Section 8 contract and applicable rules and regulations. The management agent also certifies that all data upon which the request for funds is based is true and correct, that no unauthorized payments have been received, and that records will be made available for an audit, if necessary. Most relevant to this case, the HAP contract also requires that the HAP voucher contain a certification by the Owner that, to the best of his knowledge and belief, "the dwelling units are in Decent, Safe and Sanitary condition ..."

Under the management agreement, Intervest was responsible for utilizing the HAPs to maintain the property. Intervest received a HUD-approved management fee equal to about 6% of the monthly rent and HAPs of the property.

Between January 1994 and May 1998, Defendants filed 53 HAP vouchers. On each of the 53 vouchers, Defendants certi-fied that Metro Manor was in "Decent, Safe and Sanitary" condition.

D. Actual Condition of Metro Manor Apartments and HUD Knowledge of This Condition

The Metro Manor apartment units were independently inspected at least annually by the JHA and the mortgagee, to determine whether the apartments met the Housing Quality Standards. HUD reviewed each of these inspection reports. Beginning in 1994, inspectors began to rate the physical condition of Metro Manor as "below average" or "unsatisfactory." Because of these ratings, in 1994, HUD began to perform its own physical inspections of the apartments, at least annually.

Between 1992 and 1995, Laura Ashley was a project manager with HUD who was responsible for Metro Manor. Ashley testified that as early as 1990, Metro Manor was placed on the "Troubled Projects Report" because of "physical problems." As a "troubled property," Metro Manor was regarded by HUD as a "high priority candidate" for more frequent inspections. Ashley visited Metro Manor about once a year to conduct a management review.

From 1995 to the present, Vicki Gross has been the HUD project manager responsible for Metro Manor. Gross also testified that Metro Manor was a high priority candidate because it was a troubled property. See Exhibit D–3 to Motion for Summary Judgment, at 33–34.

Brenda Mason was the contract administrator for JHA. She testified she was present on the premises only about once a year. However, Mason reviewed inspection reports from HUD to remain updated on the physical condition of Metro Manor. She testified that at one point, she was told by Pat Stewart, the on-site manager of Intervest, that conditions at Metro Manor were "terrible," and that this was "not news" to her. See Deposition of Brenda Mason, Exhibit 5 to Response to Motion for Summary Judgment filed by Government, at 85. Mason stated that the de-

scription of the property as "terrible" was not inconsistent with what she had observed when she had done physical inspections of the property. *Id.*

In accordance with the HUD handbook on Section 8 programs, in response to a HUD physical inspection, a property owner tells HUD that: it is aware of the deficiencies, it has developed a plan for correcting those deficiencies, how long it will take to correct the deficiencies, and where the money will come from to pay for the repairs. The recommended format for such a corrective action plan is a "MIO Plan." The MIO Plan must include a budget and identify what funds will be used to pay for repairs.

With regard to the "below average" inspection report ratings Metro Manor received from 1993 to 1998, HUD requested and Intervest provided MIO Plans which specified 1) what Intervest would do to bring each deficiency into compliance with the Housing Quality Standards; 2) the target deadlines for the improvements; and 3) the funding source of the improvements, which was, primarily, the monthly HAPs, and, occasionally, the escrowed reserve for replacements or a special funding source provided by HUD. See Table 2, Brief in Support of Motion for Summary Judgment, p. 20–22. HUD negotiated corrective action plans with Intervest and monitored the compliance of Intervest with the plans.

During this time, Intervest continued to submit and JHA/HUD continued to pay HAP vouchers to Intervest. Intervest asserts that it used the HAPs to fund the corrective actions. All of the HAP vouchers contained the "Owner's Certification" that the Property was in "decent, safe, and sanitary" certification.

On August 5, 1998, the Government filed a Complaint against Intervest and Nail alleging violations of the False Claims Act. In the Complaint, the Government alleged that each monthly HAP voucher constituted a false or fraudulent claim by the Defendants since the voucher certified that

the subsidized units were "decent, safe, and sanitary," when, in fact, they were not. The Government seeks penalties of $530,000 and damages of $9,282,090, which is treble the amount of HAPs paid to Defendants by HUD from 1994 to 1998.

On September 24, 1998, Intervest filed an Answer and Counterclaim against the Government. On October 14, 1998, Intervest filed a First Amended Answer and Counterclaim in which Intervest added the defense of statute of limitations. On January 19, 1999, Intervest filed a Second Amended Counterclaim against the Government. The Counterclaim asserts that the condition of the apartments is the fault of HUD, because HUD failed to sufficiently fund maintenance of the complex.

Specifically, in the Second Amended Counterclaim, Intervest alleges that HUD breached its Regulatory Agreement and HAP Contract with them by: allocating insufficient funds for the operation and maintenance of Metro Manor; denying applications submitted by Intervest to provide lump sum infusions of funds into Metro Manor; and violating Defendants' due process rights by prematurely forwarding the file on Metro Manor to the HUD Inspector General and/or the U.S. Attorney's Office for investigation and enforcement.

The Government has filed a Motion to Dismiss the Counterclaim for lack of subject matter jurisdiction. The Government asserts that while the United States has waived sovereign immunity for breach of contract issues, the United States has only waived sovereign immunity for claims under $10,000, and the Counterclaim seeks more than that. In the alternative, the Government argues that as a matter of law, HUD has not breached any of the provisions of the Regulatory Agreement or the HAP Contract.

Defendants have filed a Motion for Summary Judgment against the Government. Defendants contend that they are entitled to judgment as a matter of law because, under the undisputed facts of this case, the

Government has not established a claim against them under the False Claims Act.

Finally, the Government has filed a Motion to Exclude the Expert Testimony of Former HUD Employee James Tahash. The Government argues that Tahash is improperly attempting to provide legal opinions regarding the correct interpretation of contracts between HUD and Defendants. The Government also objects to Tahash's testimony on the ground that his provision of testimony on behalf of Defendants violates the Touhy Regulations of HUD which prohibit an "employee" of a Department from testifying as an expert or opinion witness by any party other than United States. In this case, Tahash has no factual testimony regarding the contracts at issue and is being offered as expert only. In addition, the Government argues that the testimony Tahash plans to give is protected by the attorney-client privilege. The Court will address each motion in turn.

## II. Plaintiff's Motion to Dismiss Counterclaim for Lack of Subject Matter Jurisdiction

■ The United States has waived sovereign immunity for breach of contract issues. 28 U.S.C. § 1346(a)(2). Pursuant to § 1346(a)(2), this Court has jurisdiction for actions up to $10,000. Defendants have conceded that they seek over $10,000 in damages and that § 1346(a)(2) does not confer jurisdiction over their Counterclaim.

Instead, Defendants assert that this Court has jurisdiction under the Declaratory Judgment statute, 28 U.S.C. §§ 2201, 2202, and Fed.R.Civ.P. 57. Defendants have amended their Counterclaim to seek only declaratory judgment that HUD has materially breached the Regulatory Agreement and the HAP Contract and/or caused JHA to breach the HAP Contract by failing to allocate sufficient funds to Metro Manor and by violating Defendants' due process rights. Defendants also seek a declaratory judgment that neither the Regulatory Agreement nor the HAP Con-

tract obligates Nail to invest funds into the operation or capital improvements of Metro Manor, and that the FCA claims against Defendants are dismissed.

■ The Government correctly asserts that § 2201 and Rule 57 are procedural rules regarding the use of declaratory judgments and these rules do not confer or expand the jurisdiction of this Court. See 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane § 2766, p. 641–44 (1998). In addition, Defendants' attempt to recharacterize their claims as declaratory judgment claims and thus convince this Court that their claims are no longer breach of contract claims or are worth less than $10,000 is disingenuous. The relief sought by Defendants in the Counterclaim, if granted, would easily result in damages of over $ 10,000. Defendants' Counterclaim is viable only if there exists an independent basis for subject matter jurisdiction over the Counterclaim.

Defendants argue that the FCA suit against them constitutes a limited waiver of sovereign immunity. Defendants argue that if a counterclaim arises out of the same transaction or occurrence as the government claim and the relief sought neither exceeds nor differs in kind from that sought by the United States, then there is a waiver of sovereign immunity for the counterclaim. See Defendant's Brief in Reply to Motion to Dismiss Counterclaim, p. 2 (citing *United States ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 618 (W.D.Wis.1995)). Defendants allege that by initiating a lawsuit, the United States consents to be sued through counterclaims founded on the doctrine of recoupment. Defendants cite *United States v. Moore*, in which the district court of Virginia noted

> To state a claim in recoupment, a counterclaim must assert a claim arising out of the same transaction or occurrence which is the subject matter of the government's suit and seeks relief only to the extent of diminishing or defeating the government's recovery.

*United States v. Moore,* 703 F.Supp. 455, 458 (E.D.Va.1988) (quoting *EEOC v. First National Bank,* 614 F.2d 1004, 1008 (5th Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1361, 67 L.Ed.2d 342 (1981)).

Defendants note that their Counterclaim asserts that any failure of Metro Manor to be "decent, safe, and sanitary" was caused by the fact that HUD breached its obligations under the regulatory agreement and HAP contract to adequately fund the property. Consequently, Defendants argue, the Counterclaim is founded upon recoupment.

■ The Court finds that this argument is meritless. In its Complaint, the Government is not attempting to recover from Defendants for their substantive failure to maintain Metro Manor in a "decent, safe, and sanitary" condition. The Government is attempting to recover under the False Claim Act on the ground that, in their HAP vouchers, Defendants certified that Metro Manor was "decent, safe, and sanitary," when, in fact, it was not. The Government is claiming that in so certifying, Defendants committed an intentional fraud upon the Government. The doctrine of recoupment is inappropriate in this case.

Defendants also argue that this Court has jurisdiction over the Counterclaim under the Administrative Procedure Act, 28 U.S.C. § 1331. Defendants cite the case of *Katz v. Cisneros,* 16 F.3d 1204 (Fed.Cir. 1994), in which a developer, who had entered into a HAP contract with the contract administrator of HUD, sued HUD in district court to challenge the interpretation by HUD of the regulations concerning the calculation of contract rents. *Id.* at 1206. The Federal Circuit held that the district court had subject matter jurisdiction over the suit for declaratory judgment, breach of contract, and other common law claims under § 1331. *Id.* at 1207. The court stated,

> Regardless of the characterization of the case ascribed by Hollywood Associates in its complaint, we look to the true nature of the action in determining the existence or not of jurisdiction ... For reasons discussed below, we disagree with HUD's contention that the essence of Hollywood Associates' suit is contractual and that money damages are the appropriate relief. Even where a case is contractual, however, the presence of issues which require the interpretation of federal law and regulation necessarily give rise to federal questions.

*Katz,* 16 F.3d at 1207 (citing *Conille v. Secretary of Housing and Urban Development,* 840 F.2d 105, 109 (1st Cir.1988) ("It is well established that cases involving the rights and obligations of the United States or one of its agents under a contract, entered into pursuant to authority conferred by federal statute, are governed by federal law.")). The court reasoned that the developer was not seeking "money damages."

> Hollywood Associates seeks payments to which it alleges it is entitled pursuant to federal statute and regulations; it does not seek money as compensation for a loss suffered. It wants to compel HUD to perform the calculation of contract rents in accordance with 24 C.F.R. § 882.408 and other applicable regulations. That a payment of money may flow from a decision that HUD has erroneously interpreted or applied its regulation does not change the nature of the case.

*Katz,* 16 F.3d at 1208–09 (citing *Bowen v. Massachusetts,* 487 U.S. 879, 900, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988).

Defendants contend that like the developer in *Katz,* they have raised federal questions in their Counterclaim that require the interpretation of federal law and regulations. Specifically, they point to their claim that HUD violated the regulatory framework by denying requests by Nail and Intervest to infuse funds into Metro Manor. They assert that they are seeking to compel HUD to perform the calculation of contract rents in accordance with applicable regulations and the terms

of the contracts, and that they are not seeking money damages. They contend that the equitable and prospective relief they seek cannot be granted by the Court of Federal Claims.

■ The Court finds that the holding of *Katz* is inapplicable to this case. In *Katz,* the plaintiff was challenging the interpretation of the laws which controlled payment to plaintiff. The plaintiff sought judicial interpretation of a federal regulation. In the present case, Defendants have not cited any regulations that the Court must interpret. They simply allege that the existing regulations did not provide them with adequate contract rents and that those rents were insufficient to allow them to meet their contractual obligations. The Court finds that relief is available to Defendants for the claims asserted in their Counterclaim in the Court of Federal Claims and the Administrative Procedures Act does not provide a waiver of sovereign immunity for the Counterclaim.

■■ Defendants argue that the Fraud Exception to the Contract Disputes Act gives this Court jurisdiction over the Counterclaim. The Court disagrees. The Contract Disputes Act carves out of the exclusive jurisdiction of the Court of Federal Claims "any claim involving fraud." Defendants' Counterclaim does not allege any act of fraud on the part of the Government.

■ Finally, Defendants argue that this Court has supplemental jurisdiction over the Counterclaim because it is part of the same case or controversy as the claims asserted by the Government under the FCA. However, the United States does not waive sovereign immunity for counterclaims simply by filing suit against a party. See 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane § 1427, p. 194 (noting that in an action instituted by the government, a counterclaim, like any other claim against the United States, can be inter-

posed only when the government has waived its immunity from suit on that claim).

In this case, Defendants have not established that the Government waived its sovereign immunity against breach of contract suits seeking damages over $10,000. For this reason, the Court does not have subject matter jurisdiction over the Counterclaim, and the Counterclaim must be dismissed [1].

### III. *Defendants' Motion for Summary Judgment*

#### A. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure states in relevant part that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Moore v. Mississippi Valley State Univ.,* 871 F.2d 545, 549 (5th Cir.1989); *Washington v. Armstrong World Indus.,* 839 F.2d 1121, 1122 (5th Cir.1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The movant need not,

---

1. Since the Court is dismissing the Counterclaim for lack of subject matter jurisdiction, the Court will not address the merits of the Counterclaim.

however, support the motion with materials that negate the opponent's claim. *Id.* As to issues on which the non-moving party has the burden of proof at trial, the moving party need only point to portions of the record that demonstrate an absence of evidence to support the non-moving party's claim. *Id.* at 323–324, 106 S.Ct. 2548. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. The district court, therefore, must not "resolve factual disputes by weighing conflicting evidence, . . . since it is the province of the jury to assess the probative value of the evidence." *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980). Summary judgment is improper where the court merely believes it unlikely that the non-moving party will prevail at trial. *National Screen Serv. Corp. v. Poster Exchange, Inc.,* 305 F.2d 647, 651 (5th Cir.1962).

B. Analysis

1. The False Claims Act

The False Claims Act, 31 U.S.C.A. § 3729(a), states:

Any person who . . .

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . .

is liable to the United States Government for a civil penalty . . .

31 U.S.C.A. § 3729(a) (1994).

■ Under 31 U.S.C.A. § 3729, "claim" is defined as

any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C.A. § 3729(c) (1994). Where the Government has conditioned payment of a claim upon a claimant's certification of compliance with a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation. *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997).

■ The elements of a False Claim Act violation are:

(1) the [claimant] presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; (3) the [claimant] knew the claim was false or fraudulent; and (4) the United States suffered damages as a result of the false or fraudulent claim.

*Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1043 (Fed.Cir.1994).

■ In addition to the above-listed elements, the False Claim Act imposes a materiality requirement. *United States ex rel. Berge v. Board of Trustees of the University of Alabama,* 104 F.3d 1453, 1459 (4th Cir.), cert. denied, —— U.S. ——, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997). *See Tyger Constr. Co. v. United States,* 28 Fed.Cl. 35, 55 (1993) ("[T]he FCA covers only those false statements that are material."); *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 461 (5th Cir. 1977). "Material" has been defined as "an essential, important, or pertinent part of the claim." *Tyger Constr. Co.,* 28 Fed.Cl. at 55. "Materiality depends on whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 (4th Cir.1999) (citing *Berge,* 104 F.3d at 1459 and quoting *United*

*States v. Norris,* 749 F.2d 1116, 1122 (4th Cir.1984)).

The question of whether a false statement is material is a mixed question of law and fact. *Berge,* 104 F.3d at 1460. However, even though it is a mixed question of law and fact, the question of materiality is one to be decided by the Court. *Id.*

## 2. The alleged false claim

As stated earlier, the alleged false claims in this case were the signed certifications on 53 HAP Vouchers stating that Metro Manor was in a "decent, safe, and sanitary" condition. The Government asserts in its Complaint and in its Response to the Motion for Summary Judgment that the property was not "decent, safe, and sanitary" under any conceivable definition of those terms.

Defendants appear to take conflicting positions on this issue. On one hand, Defendants claim that the certification was not false. Defendants contend that the Government has no testimony to show that the Metro Manor units failed to be "decent, safe, and sanitary." Defendants also assert that the Housing Quality Standards did not apply to Metro Manor. See Defendants' Memorandum Rebuttal Brief, p. 14–15.

On the other hand, Defendants concede that the property had ongoing problems and physical deficiencies which were identified in inspection reports from 1993 to 1998. Defendants discuss the fact that the Owner of Metro Manor consistently submitted MIO Plans to correct these deficiencies. Defendants assert that all deficiencies for which MIO Plans were submitted indicated to HUD and JHA that the property was not "decent, safe, and sanitary." See Defendants' Brief in Support of Motion for Summary Judgment, p. 18.

Viewing the facts in a light most favorable to the non-movant, the Court finds, for purposes of this Motion, that during the time that the 53 HAP Vouchers at issue were submitted to JHA, there is no genuine issue of material fact as to whether the condition of the property was "decent, safe, or sanitary" under the general meanings of those terms. It was not.

## 3. Materiality

Defendants assert that the certification accompanying the HAP voucher was not material to the decision of HUD or JHA to pay the HAP. Defendants contend that under the HAP Contract, the failure of a unit to meet the "decent, safe, and sanitary" standard does not allow JHA to abate or refuse to pay the Section 8 HAP for that particular unit. Defendants assert that JHA frequently pays HAPs for units that are not "decent, safe, and sanitary," and that the HAPs are intended to be used by the Owner to correct physical deficiencies in the units.

Defendants note that inspection reports since 1993 informed HUD of all of the physical deficiencies at Metro Manor and that Metro Manor consistently received inspection reports of "unsatisfactory" and "below average." Defendants point to the deposition testimony of Vicki Gross, who stated that it is her general understanding that properties receiving "below average" and "unsatisfactory" physical condition ratings in inspection reports are not providing "decent, safe, and sanitary" housing. See Deposition of Vicki Gross, Exhibit D–4 to Motion for Summary Judgment, p. 50–51.

Most importantly, Defendants point to the testimony of Brenda Mason. Mason testified in her deposition that during the time that she was authorizing payment of HAPs on Metro Manor from January 1994 to May 1998, she believed, based on her inspections of the property, that Metro Manor failed the "decent, safe, and sanitary" standard. Yet, she continued to make the payments. Defendants argue that this testimony proves that the HAP Voucher certification that the property was "decent, safe, and sanitary" was not mate-

rial to the decision to pay the HAP to the Owner.

The Government argues that the HAP Voucher certification that the property is "decent, safe, and sanitary" is material to the decision to make a HAP payment. The Government asserts that the first thing Mason did when receiving a monthly HAP voucher was to verify that the certification was signed by the owner or an agent of the owner before reviewing the remainder of the voucher and sending it to accounting for payment. See Brief in Support of Response to Motion for Summary Judgment, p. 30. The Government avers that the HAP Voucher certification, which establishes compliance with the regulations requiring the Property to be "decent, safe, and sanitary," is a prerequisite to payment. Thus, the Government argues, Defendants received a government benefit (the HAP) predicated on their certification that they were in compliance with the regulations, and certification was material to the payment of the benefit.

In sum, the Government asserts that had Defendants failed to certify that the units were not decent, safe, and sanitary, no payment would have been made. The Government argues that Defendants' assertion that no certification was required in order for them to receive monthly HAP payments is factually incorrect.

With regard to Defendants' allegations regarding Mason's opinion that Metro Manor was not "decent, safe, and sanitary" at the time she was authorizing the HAP payments, the Government asserts that Mason had incomplete information about the conditions at Metro Manor, and that, in light of the signed certifications, she did not believe she could take any action other than payment. The Government contends that Mason did not receive all of the physical inspection reports and was only physically present at Metro Manor once a year.

The Court finds that, although there appears to be a disputed issue of fact regarding whether the certification was a prerequisite to payment, for purposes of this Motion, it is assumed that the signed certification was required in order for Defendants to receive the HAP. As such, the HAP Voucher certification that Metro Manor was in "decent, safe, and sanitary" condition was, in a technical sense "required." in the decision to pay the HAP.

■ However, the Court does not find that the certification was substantively material to the decision to pay the HAP. Since 1993, JHA and HUD engaged a pattern of paying the HAP Vouchers despite the fact that inspection reports they were receiving indicated that the certification was not true, or, that under their own definitions of those terms, Metro Manor was not "decent, safe, and sanitary." Mason testified that she believed [2] that Metro Manor was not "decent, safe, and sanitary," but she authorized the HAPs as a matter of normal course, despite this belief. In fact, she testified in her deposition that at one point within two years prior to 1998, she discussed the problems she had seen at Metro Manor with a HUD representative. See Exhibit D–4 of Motion for Summary Judgment, p. 121–123. Mason explained to the HUD employee that she believed the property was less than "decent, safe, and sanitary," and asked if it would be possible for HUD to abate the payments because "something had to be

2. The Court does not find that the Government has established a genuine issue of material fact regarding whether Mason had an adequate basis for her belief that Metro Manor was not "decent, safe, and sanitary." The Government has offered nothing to rebut Mason's own deposition testimony. In her deposition, Mason testified that she consistently familiarized herself with HUD and mortgagee inspection reports for JHA properties, including Metro Manor. See Exhibit D–4 to Motion for Summary Judgment, p. 78–79. She also conducted her own inspections yearly. As part of her work, she regularly reached conclusions regarding whether properties were "decent, safe, and sanitary." Id. at 101. It was her professional opinion that, over an extended period of time, Metro Manor was not "decent, safe, or sanitary."

done." Id. at 123. She was told that HUD could not do that. Id. Clearly, HUD was unconcerned with the apparent discrepancy between the HAP Voucher certification and the actual condition of the property and intended to continue the payments.

Indeed, it was contemplated by both parties that the HAPs would be used to bring the property into a "decent, safe, and sanitary" condition. The fact that a HAP is intended to be used as a corrective tool indicates that the property for which a HAP is sought is not expected to be in perfect shape at the time a HAP Voucher is filed.

The Government spends a great deal of time in its Brief arguing that, over the years, the Owners made distributions of surplus cash to themselves from Metro Manor (instead of using the surplus cash to properly maintain the property), that it was the Owner's responsibility to maintain the property, and that Nail and Intervest repeatedly promised to make repairs to Metro Manor but failed to live up to those promises. If this were an action for breach of the substantive duty to keep the property in a "decent, safe, and sanitary" condition under the Regulatory Agreement, these arguments would be relevant. However, this is an action under the False Claims Act. The Court is only concerned with the materiality of the certification on the HAP Vouchers. While the Defendants' certification may have been technically inaccurate, the Court does not find that Defendants acted with fraudulent intent or that they were attempting to hide anything from the Government.

The Court finds that there are no disputed issues of material fact in this case. Under the False Claims Act, a misrepresentation must be material in order for liability to attach, and in this case, the Court finds that the certification was not substantively material to the decision of Mason and HUD to continue paying the HAP vouchers submitted by Defendants. In regard to this housing project, the ten-

ants have not been provided with decent, safe, or sanitary housing as required by Congress and the taxpayers have not received their money's worth. However, this case does not require this Court to place the fault of those failures, whether at the hands of HUD, JHA or Defendants. The controlling issue in this case is whether the certifications of the Defendants as to the condition of the property were material to HUD. Clearly they were not. HUD has continued to pay HAP vouchers since 1994 when it knew from its own inspection reports that the certifications were false. For this reason, the Court finds that Defendants are entitled to judgment at a matter of law on the claims asserted against them by the Government. Because the Court is granting Defendants' Motion for Summary Judgment, the Motion to Exclude Expert Testimony from Former HUD Employee James Tahash is moot, and is thus denied.

### V. *Conclusion*

For all of the above-stated reasons, the Court finds that the Motion to Dismiss the Defendants' Counterclaim for lack of subject matter is well taken and should be granted, and the Motion for Summary Judgment filed by Defendants is also well taken and should be granted. The Motion to Exclude Expert Testimony from Former HUD Employee James Tahash is moot, and is thus denied.

IT IS THEREFORE ORDERED that the Motion of the Government to Dismiss Counterclaim [63–1] filed by Defendants is hereby granted.

IT IS FURTHER ORDERED that the Motion for Summary Judgment [64–1] filed by Defendants is hereby granted.

IT IS FURTHER ORDERED that the Motion to Exclude Expert Testimony from Former HUD Employee James Tahash [59–1] is moot, and is hereby denied.

Based on this Opinion and Order, a Final Judgment will be entered this day in

accordance with the terms of Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED.